# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF A MEMBER | § | |
| OF THE BAR OF THE SUPREME | § | |
| COURT OF DELAWARE | § | |
| | § | No. 25, 2023 |
| RICHARD L. ABBOTT, | § | Board Case No. 112512-B |
| ESQUIRE, | § | |
| | § | |
| Respondent. | § | |
| | § | |

Submitted: June 28, 2023
Decided: November 9, 2023

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

Upon Review of the Reports of the Board on Professional Responsibility. **DISBARRED**.

David A. White, Esquire, Chief Disciplinary Counsel, and Kathleen M. Vavala, Esquire, Deputy Disciplinary Counsel, Office of Disciplinary Counsel, Wilmington, Delaware.

Richard L. Abbott, Esquire, Hockessin, Delaware.

*PER CURIAM*:

This lawyer disciplinary proceeding arises from Respondent Richard L. Abbott's conduct in *Seabreeze Homeowners Assoc. v. Jenney*, C.A. No. 8635-VCG (Del. Ch.) ("Seabreeze Litigation")—a dispute over the trimming of trees and shrubbery between a homeowners' association and a property owner—as well as statements he made in filings related to this disciplinary proceeding. We cannot help but lament that a seemingly mundane lawsuit would escalate into a nasty feud and, in turn, prompt Abbott, an experienced litigator, to ignore fundamental ethical constraints, putting his privilege to practice law at risk. The genesis of this disciplinary action was advice Abbott gave to his client to help the client violate an order and bench rulings issued by the Court of Chancery. The advice and the documentation that effectuated it was followed by misrepresentations to the court as to the client's status *vis-à-vis* the court's order and rulings. And when the trial judge who had issued the order and rulings learned of Abbott's dodgy stratagem and reported the matter to the Office of Disciplinary Counsel ("ODC"), Abbott's conduct only got worse. Abbott eschewed a lawyerly defense of his questionable actions and, despite being previously disciplined for similar misconduct, unleashed a persistent flurry of false invective impugning the integrity of the trial judge, ODC, and eventually this Court.

2

Not surprisingly, Abbott's conduct in the Seabreeze Litigation prompted ODC to open an investigation in 2015, which led to a petition for discipline in 2020. Through a variety of procedural maneuvers, Abbott succeeded in delaying ODC's filing of the petition and the Board on Professional Responsibility's consideration of the petition for years.

In due course, however, a panel of the Board on Professional Responsibility ("Panel") found that ODC established by clear and convincing evidence that Abbott violated Rules 3.5(d),[1] 8.4(c),[2] and 8.4(d)[3] of the Delaware Lawyers' Rules of Professional Conduct ("DLRPC"). The Panel found that ODC did not establish by clear and convincing evidence that Abbott violated Rules 3.4(c)[4] or 8.4(a).[5] A majority of the Panel ("Panel Majority") recommended a two-year suspension for Abbott's disciplinary violations. The chair of the Panel ("Panel Chair") recommended disbarment.

---

[1] Rule 3.5(d) provides that a lawyer shall not "engage in conduct intended to disrupt a tribunal or engage in undignified or discourteous conduct that is degrading to a tribunal."

[2] Rule 8.4(c) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[3] Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

[4] Rule 3.4(c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal, except for an open refusal based on an assertion that no valid obligation exists."

[5] Rule 8.4(a) provides that "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so or do so through the acts of another."

Both ODC and Abbott have filed objections to the Panel's findings and recommendations. After our independent review of the Panel's recommendations, we conclude that Abbott violated Rules 3.4(c), 3.5(d), 8.4(a), 8.4(c) and 8.4(d) of the DLRPC and that the appropriate sanction is disbarment.

I.

A.

The Seabreeze Litigation arose from a dispute between Marshall Jenney, the owner of two properties at 317 Salisbury Street and 318 Salisbury Street in Rehoboth Beach (collectively, the "Properties"), and the Seabreeze Homeowners' Association, Inc. ("Seabreeze"). In 2011, Seabreeze filed a Court of Chancery action against Jenney for a mandatory injunction requiring Jenney to trim trees and shrubs on the Properties. Jenney and Seabreeze resolved the action in a settlement agreement dated December 21, 2012 ("Settlement Agreement"). Under the Settlement Agreement, Jenney agreed to trim the trees and shrubs on the Properties and Seabreeze agreed to dismiss the action.

After Jenney failed to comply with the Settlement Agreement, Seabreeze instituted the Seabreeze Litigation in June 2013. Seabreeze sought specific performance of the Settlement Agreement. Jenney and Seabreeze

resolved the matter in a stipulation and consent order granted by the Court of Chancery on July 11, 2014 ("Consent Order"). Under the Consent Order, Jenney was required to take steps to ensure that the trees and shrubs on the Properties would be trimmed by October 31, 2014.[6] Time was of the essence.[7] Paragraph 17 of the Consent Order provided that it was "for the benefit of, and shall be binding on, all Parties and their respective successors, heirs, assigns, officers, and directors."[8] After Jenney failed to take the necessary steps for completion of the work by October 31, 2014, Seabreeze filed a motion for a rule to show cause hearing on November 3, 2014. On November 6, 2014, Jenney filed a response stating that he did "not refuse to have the work performed as expeditiously as possible" and requested an extension to have the work completed by November 21, 2014.[9]

## B.

On December 5, 2014, Abbott entered his appearance for Jenney in the Seabreeze Litigation. Abbott was Jenney's fourth or fifth attorney since the filing of the original action in 2011. Between December 2014 and March 2015, the parties filed competing motions and appeared before the Vice

---

[6] Consent Order ¶ 2, Admitted Hearing Exhibit (hereinafter referred to as "Ex. __"), Ex. 196 at Ex. 1 ¶ 2.
[7] *Id.* ¶ 13.
[8] *Id.* ¶ 17.
[9] Respondent's Response to Petitioner's Motion for Rule to Show Cause Hearing for Respondent's Violation of the July 11, 2014 Consent Order, Ex. 197 ¶ 11.

Chancellor multiple times. As described by the Panel, "Seabreeze generally alleged that Jenney failed to comply with the Consent Order by not trimming the trees and shrubs; Jenney generally accused Seabreeze of interfering with Jenney's attempts to comply with the Consent Order."[10] The Vice Chancellor reaffirmed Jenney's obligation to trim the trees and shrubs in bench rulings on January 15, 2015 and February 23, 2015.

At the February 23, 2015 hearing, the Vice Chancellor directed the parties to submit a proposed form of order encompassing how the trees and shrubs were to be trimmed within a reasonable amount of time and the attorneys' fees to be awarded to Seabreeze for Jenney's breach of the Consent Order. Abbott and Seabreeze's counsel exchanged emails regarding the proposed form of order. On February 25, 2015, Seabreeze's counsel submitted a form of order to the Court of Chancery ("February 25, 2015 Order"). The Vice Chancellor granted the order shortly thereafter.

Later that day, Abbott filed a motion for reargument, arguing that Seabreeze's counsel had misrepresented Abbott's agreement to the form of order and included language in the order that was not discussed or contemplated at the February 23, 2015 hearing. On behalf of Jenney, he

---

[10] July 11, 2022 Recommendation of Panel of Board on Professional Responsibility on the Discipline of Richard L. Abbott, Esquire (hereinafter referred to as "July 11, 2022 Recommendation at __") at 15.

sought attorneys' fees incurred in filing the motion for reargument. Seabreeze's counsel objected to Abbott's statements and filed a counter-motion for Rule 11 sanctions.

After additional submissions by the parties, the Vice Chancellor held a hearing on March 3, 2015, and made several rulings ("March 3, 2015 Bench Rulings"). The Vice Chancellor modified the February 25, 2015 Order to, among other things, remove language finding Jenney in contempt. As a result of the March 3, 2015 Bench Rulings, Jenney had to complete the trimming of the trees and shrubs on 318 Salisbury Street within eight weeks of the February 25, 2015 Order, which was April 22, 2015.

The Vice Chancellor directed the parties to submit additional documents regarding the amount of attorneys' fees sought by Seabreeze. As to Jenney's request for attorneys' fees, the Vice Chancellor described Seabreeze counsel's conduct as possibly "less than precise or best practice legal work," but found no intentional misrepresentation or bad-faith litigation conduct that merited an award of attorneys' fees.[11] Seabreeze withdrew the motion for Rule 11 sanctions. On March 6, 2015, Seabreeze informed the Court of Chancery that more trimming work needed to be performed at 317 Salisbury Street.

---

[11] Ex. 52 at 21.

## C.

On March 7, 2015, Abbott sent Jenney an email outlining a legal strategy to avoid enforcement of the Settlement Agreement, Consent Order, and March 3, 2015 Bench Rulings. Abbott first opined that it was clear Seabreeze would not stop harassing Jenney while he owned the Properties and that the Vice Chancellor did not understand this or care about the amount of harassment over trees and shrubs. He then stated that, as previously discussed, conveying title to another entity controlled by Jenney was not a viable option for circumvention of the Settlement Agreement and Consent Order because the Vice Chancellor would likely exercise his equitable powers to make Jenney personally responsible. Abbott went on to advise:

> So this morning I came up with this theory – CONVEY BOTH PROPERTIES to [Jenney's wife].
>
> No tax consequences will result since she is your wife. And then I can advise the Court and [Seabreeze's counsel] that there is no need for any further activity in the case since it is now moot— i.e.[,] you are no longer the title owner AND the Settlement Agreement and Consent Order are purely personal obligations of yours that it would then be impossible for you to perform.
>
> If Seabreeze and [Seabreeze's counsel] wanted to make the obligation on trees and hedges to be perpetual, then they should have made them run with the land. But they did not—enabling me to happily point out that [Seabreeze's counsel] probably committed malpractice. Indeed, if you sold the properties on the market, then you would be off the hook. The same follows if you convey to [your wife].

8

Now Seabreeze might file a new action against [your wife], but then we would have a clean slate to fight against them and get the case tossed out. [Seabreeze's counsel] will kick and scream that the transfer is a sham, but the law is the law. And a wife has not legally been deemed to be a mere legal extension/appendage of her husband since the Married Woman's Property Act passed in Delaware about 140 years ago.

Let me know if you can do this, based on an Pre-Nuptial Agreement, any Trust, and any other financial or legal issues unique to you situation. You can just wait a few years and then have [your wife] convey the parcels back to you, at which time Seabreeze would likely do nothing (and if they did they would probably have to file a new case against you).[12]

Abbott did not mention the language in Paragraph 17 of the Consent Order providing that it was binding on Jenney's successors, heirs, and assigns. Jenney agreed to Abbott's proposed strategy. During the disciplinary proceeding, Jenney testified that Seabreeze had been harassing him and that Abbott advised him transferring the Properties would be a way to end the Seabreeze Litigation. Jenney also testified that at the time of Abbott's advice he "maybe, most likely" would transfer the Properties back to himself within six months.[13] After Jenney agreed to the proposed strategy, Abbott instructed his assistant to prepare the deed transfers and a letter to the Vice Chancellor informing him of the transfer of the Properties.

---

[12] Mar. 7, 2015 Email, Ex. 236.
[13] Nov. 10, 2021 Tr. at 991–92.

In a March 9, 2015 email, Jenney told Abbott that his wife was amenable to the transfer and asked about establishing a post office box as a legal address "to make it as hard as possible for her to be served."[14]  Abbott responded that same day, advising that Abbott's address would appear on the deed and he would not accept service of any new filing.[15]  Abbott also acknowledged Paragraph 17 of the Consent Order:

> First we will have to deal with [Seabreeze counsel's] inevitable filing with the Court challenging the effect of the transfer.  I am hoping the Court wants to be rid of the matter and shoots him down.  I am sure [Seabreeze's counsel] will argue that [your wife] takes title subject to all of the requirements imposed on you, which would be based on some unfortunate language in the Consent Order . . . "binding on heirs, successors, assigns."  It is clear that the original Settlement Agreement did not run with the land, and was only binding on you[] personally, but the Order language could give [Seabreeze's counsel] a shot at arguing that it ran with the land.[16]

Based on Abbott's advice and assistance, on March 12, 2015, Jenney executed two deeds transferring the Properties to his wife, each for the nominal amount of $10.00.  Abbott's office then recorded the deeds.

D.

In his March 16, 2015 letter to the Vice Chancellor ("March 16, 2015 Letter"), Abbott stated:

---

[14] Mar. 9, 2015 emails, Ex. 237.
[15] *Id.*
[16] *Id.*

I am writing to advise the Court that no further proceedings in this action will be necessary, other than on the pending requests for awards of attorneys' fees. The remainder of the action is now legally moot.

Enclosed please find a copy of the Deeds transferring title from Marshall T. Jenney to Erin C. Jenney, which were recorded on March 13, 2015. As a result, Mr. Jenney no longer has any ownership interest in the properties and is therefore relieved of the purely *in personam* obligations under the Settlement Agreement.

Mr. Jenney and I appreciate the Court's courtesies in this matter.[17]

Abbott did not mention Paragraph 17 of the Consent Order or that Jenney would continue to exercise control over the Properties.

On March 17, 2015, Seabreeze filed a renewed motion for a rule to show cause hearing on Jenney's violation of the Consent Order and a motion to join Jenney's wife as an indispensable party. Jenney opposed the motions and filed a motion to strike statements in Seabreeze's filings and a Rule 60(b) motion to reopen the Consent Order.

On April 13, 2015, the Vice Chancellor granted Seabreeze's motion to join Jenney's wife as an indispensable party. The Vice Chancellor also held an evidentiary hearing on Seabreeze's renewed motion for a rule to show cause that day. At the beginning of the hearing, the Vice Chancellor denied

---

[17] Ex. 57.

11

Jenney's motion to strike and Rule 60(b) motion. The Vice Chancellor then heard testimony from several witnesses including Jenney. When Jenney was asked if he ever had any intent of complying with the Consent Order, he testified:

> Well, I was so upset with my neighbors and the way I was treated, considering I was born and raised in this neighborhood that, you know, I figured that I still might sell the property. So I wanted to make sure with my lawyer that there was no language, you know, that would state that it would run with land or pass to the person I sold it to. So that was my thought process.[18]

Jenney initially denied discussing the transfer of the Properties with Abbott, but then admitted otherwise:

> Question: So you did discuss with Mr. Abbott the reasons for transfer from you to Erin Jenney of the two properties?
>
> Answer: Yes. So it was either I take the properties to market and sell them to circumvent, or, you know, my attorney said, "If you want to retain it, stay in the neighborhood and keep your family home, you can transfer it to your wife."
>
> Question: And you had that discussion about transferring it to your wife so that you didn't have to comply with the court order. Correct?
>
> Answer: Can you ask your question again?
>
> Question: Yeah. You had the discussion about transferring the two properties from you to your wife so you did not have to comply with the court order. Correct?

---

[18] Apr. 13, 2015 Tr. (Del. Ch.) at 56–57, Ex. 64.

Answer: I mean, it was—yeah. Yes.[19]

Jenney testified similarly at the disciplinary hearing, stating that the purpose of the transfer of the Properties was to end the Seabreeze Litigation and to force Seabreeze to start the case over again. Abbott also testified that the purpose of the transfer was to end the Seabreeze Litigation:

> [T]he deed transfer became a necessity, because essentially it was never going to end, otherwise, in my estimation, based on, you know, a few—two, three months of experience in seeing this, and No. 1, [Seabreeze's counsel] was going to continue I think I used at one point, "ad finitum" and "ad nauseam."[20]

After the witnesses testified at the April 13, 2015 hearing, Abbott argued, among other things, that he thought the Vice Chancellor was going to issue another written order after the March 3, 2015 hearing, but also said that he had calculated the eight-week deadline to complete the trimming work from the February 25, 2015 Order. He contended that Jenney was entitled to transfer the Properties and that, in any event, the transfer caused no harm because the Vice Chancellor had granted Seabreeze's motion to join Erin Jenney as a party.

At the conclusion of the hearing, the Vice Chancellor expressed his disbelief at what had transpired:

---

[19] *Id.* at 61–62. Abbott did not object to this line of questioning at the hearing.
[20] Nov. 10, 2021 Tr. at 1225–27.

13

[D]espite having done many, many, many homeowner cases, I have never had a defendant in one of those cases sit in a witness chair and tell me that he didn't intend to comply with his agreement because he was upset with his neighbors and he might want to sell the property. Nor have I ever had anybody sit in a witness chair and tell me that on advice of counsel, he had entered into a sham transaction to frustrate the specific performance of an agreement.

It is shocking to me. It is unacceptable. It is unacceptable behavior for a litigant in this Court. It is unacceptable behavior for an attorney in this Court.

So it's clear to me there was contempt of my bench order and of the stipulation and order of this Court. But we're not going to end this hearing today with me finding contempt because, like Mr. Abbott, I want to kill this action. I want it over.[21]

The Vice Chancellor suspended the hearing to be reconvened at the Properties to determine what needed to be trimmed and the proper remedy for contempt. The reconvened hearing at the Properties was scheduled for May 21, 2015.

On May 8, 2015, the Jenneys filed a notice of appeal in this Court. The Court dismissed the appeal because it was interlocutory and the Jenneys had not complied with Rule 42.[22]

E.

On May 21, 2015, the Vice Chancellor conducted a hearing at the Properties to determine the necessary trimming and then reconvened the

---

[21] Ex. 64 at 112–13.
[22] *Jenney v. Seabreeze Homeowners Ass'n, Inc.*, 116 A.3d 1244, 2015 WL 3824867, at *2 (Del. June 18, 2015) (TABLE).

14

hearing at the courthouse. At the courthouse, the Vice Chancellor confirmed his previous finding of contempt based on a sham transfer intended solely to avoid enforcement of a court order. The Vice Chancellor awarded Seabreeze its costs and attorneys' fees in responding to the transfer of the Properties and left it to Abbott and Jenney to determine who would pay. Recognizing this Court's exclusive role in addressing ethical violations, the Vice Chancellor stated that he would refer the matter to ODC.

On June 1, 2015, the Court of Chancery entered an order ruling that the necessary work had been completed at 317 Salisbury Street and setting forth the work on 318 Salisbury Street to be completed by June 30, 2015. On June 10, 2015, a Court of Chancery employee sent a letter to the then-Chief Disciplinary Counsel informing her of the Vice Chancellor's May 21, 2015 bench ruling and providing the docket entries and transcripts in the Seabreeze Litigation for a review of Abbott's conduct. On June 11, 2015, the Vice Chancellor reconfirmed his previous contempt findings and awarded Seabreeze fees and costs. The required work was completed and the case was dismissed on August 21, 2015.

Eight months after the transfer, Jenney reconveyed the Properties back to himself because he wanted to refinance loans that had remained in his name. During the disciplinary hearing, Jenney testified that he had just as much

15

control over the Properties after the transfer to his wife as he did before. As to 317 Salisbury Street, Jenney paid the taxes, bills, and maintenance, hired contractors as necessary, and collected rent. As to 318 Salisbury Street, he paid all the property taxes, bills, and maintenance costs. No one else undertook these responsibilities for either property.

## II.

Since his referral to ODC in June 2015, Abbott has challenged or litigated aspects of this disciplinary proceeding in multiple venues. Some of his statements in this proceeding and other proceedings gave rise to additional disciplinary violations.

## A.

In June 2015, Abbott filed a complaint against the Vice Chancellor in the Court on the Judiciary.[23] He alleged that the Vice Chancellor acted with bias against him in the Seabreeze Litigation. The former Chief Justice

---

[23] Court on the Judiciary proceedings are normally confidential. Ct. Jud. R. 17. But as discussed in then-Chief Justice Strine's denial of Abbott's motion for recusal in *Abbott v. Del. State Pub. Integrity Comm'n*, it could be fairly inferred from Abbott's filings in the Public Integrity Commission ("PIC"), discussed in more detail herein, that he had filed a complaint against the Vice Chancellor in the Court on the Judiciary. No. 155, 2018, Order (Del. Feb. 25, 2019). After learning of Abbott's complaint, ODC contacted the Clerk of the Court on the Judiciary for access to the Court on the Judiciary records. *Id.* at 6. *See also Abbott v. Del. State Pub. Integrity Comm'n*, 206 A.3d 260, 2019 WL 937184, at *6-7 (Del. Feb. 25, 2019) (TABLE). The Vice Chancellor consented to waive the confidentiality of the Court on the Judiciary records for the limited purpose of *In re Abbott*, ODC File No. 112512B. *Id.*

16

dismissed the complaint, concluding that the record was devoid of any facts or reason showing why the Vice Chancellor would be biased against Abbott.

On July 23, 2015, ODC advised Abbott that it had opened a file following the Vice Chancellor's referral. ODC asked Abbott to provide any documents he thought would be relevant to ODC's investigation. Abbott objected to the Vice Chancellor's referral, but indicated that he would provide documents.

In April 2016, ODC advised Abbott that ODC intended to proceed with a formal investigation because there was a reasonable inference that he had violated Rules 3.5(d), 4.4(a), and 8.4(d) of the DLRPC. As part of this investigation, ODC would determine whether to present the matter to a panel of the Preliminary Review Committee ("PRC").[24] The PRC could dismiss the matter, offer a sanction of a private admonition, or approve the filing of a petition for discipline with the Board.[25] Between May and September 2016, ODC and Abbott engaged in frequent communications and motion practice regarding various issues. These issues included ODC's efforts to obtain documents relating to Abbott's advice to Jenney about the transfer of the Properties, Abbott's requests that the then-Chief Disciplinary Counsel and the

---

[24] Delaware Lawyers' Rules of Disciplinary Procedure ("DLRDP") 9(b).
[25] *Id.*

17

then-Board Chair recuse themselves, and Abbott's requests for a stay pending resolution of his recusal requests.

On July 13, 2016, ODC filed a motion to compel the production of documents from Abbott concerning his advice about the transfer of the Properties. ODC also informed Abbott that it would present a disciplinary petition to the PRC on August 3, 2016, and that Abbott could submit written materials for the PRC to consider by July 26, 2016. ODC agreed later to defer presentation of the petition to the PRC until October.

On July 22, 2016, Abbott filed a complaint against then-Chief Disciplinary Counsel with the Public Integrity Commission ("PIC"). He alleged that there was an appearance of impropriety because she was pursuing the investigation to advance her own judicial ambitions and improperly seeking privileged documents. On August 24, 2016, the PIC dismissed the complaint for lack of jurisdiction.

On September 13, 2016, ODC informed Abbott that it would present a petition for discipline to the PRC on October 5, 2016. ODC also advised Abbott that he had to provide any materials he wished the PRC to consider by September 29, 2016.

On September 16, 2016, Abbott filed three motions with the Board that inappropriately attacked the Vice Chancellor. Abbott alleged, among other things, that:

- Obviously, the Vice Chancellor wanted to mete out his anger all the more by attempting to harm me as a punishment for daring to do my job in furtherance of his own personal and emotional issues.[26]

- <u>The Court conducted a last minute, surprise "Star Chamber" proceeding, first announced at the end of the site visit, in order to tongue lash me and doctor up the record with conclusory, unsupported, and false *ad hominem* attacks on me.</u>[27]

- The allegation of "vexatious" transfer of title is also a figment of the Vice Chancellor's very active imagination.[28]

- Rather than congratulating and applauding the undersigned counsel for his zealous representation through appropriate and permissible means, the Vice Chancellor's frustration, aggravation, and anger literally caused his emotions to get him carried away. He lashed out at the undersigned counsel and spouted out wildly unsupported and false statements in an effort to gin-up a record for purposes of this personal retribution proceeding.[29]

- The fact that Vice Chancellor went to the lengths he did in attempting to besmirch the reputation of the undersigned counsel through false attack commentary constitutes clear evidence of his ill-intent and bad faith. He concocted a

---

[26] Sept. 16, 2016 Response in Opposition to Motion to Compel ¶ 9, Ex. 105.
[27] *Id.* ¶ 14(f) (emphasis in original).
[28] *Id.* ¶ 30.
[29] Sept. 16, 2016 Motion for Stay and Recusal of Board Chair ¶ 12, Ex. 240.

19

fairytale story in the hopes that he could sell it to someone who would buy his spin and abuse the system by meting out his revenge on undersigned counsel despite the fact that no misconduct of any sort had occurred.[30]

That same day Abbott filed a complaint against the then-Board Chair with the PIC. With the complaint, he included two of the Board filings in which he made numerous inappropriate attacks on the Vice Chancellor.[31] The PIC dismissed the complaint.

On September 20, 2016, the then-Board Chair stayed ODC's motion to compel pending resolution of Abbott's motion to recuse. On September 21, 2016, Abbott filed a complaint for a writ of *certiorari* in the Superior Court, challenging the PIC's dismissal of his complaint against then-Chief Disciplinary Counsel. On September 23, 2016, the Jenneys filed a complaint against then-Chief Disciplinary Counsel with ODC. The Court appointed outside counsel to act as Special Disciplinary Counsel and to investigate the matter.[32]

On September 29, 2016, in anticipation of the October 5, 2016 PRC hearing, Abbott submitted information for the PRC to consider. He also

---

[30] *Id.* ¶ 14. *See also* Sept. 16, 2016 Motion for Stay and Disqualification of ODC Counsel ¶ 15, Ex. 239 (describing the Vice Chancellor's referral of Abbott to ODC as a "bogus, unfounded, and ill-intended Complaint").

[31] Ex. 241 (enclosing copy of Motion for Stay and Recusal of Board Chair, Ex. 240 and Sept. 16, 2016 Response in Opposition to Motion to Compel, Ex. 105). *See also supra* nn. 26–29.

[32] This attorney later became Chief Disciplinary Counsel in 2021.

requested a stay of the matter. On September 30, 2016, ODC informed Abbott that it would withdraw its intended presentation to the PRC in light of his pending motion to stay and his request that the PRC stay its consideration of the matter.

On November 29, 2016, Special Disciplinary Counsel recommended that this Court dismiss the Jenneys' complaint based on his opinion that then-Chief Disciplinary Counsel did not violate the ethical rules by seeking discovery of Abbott's advice to the Jenneys regarding transfer of the Properties. This Court accepted the recommendation and dismissed the complaint.

On February 28, 2018, the Superior Court affirmed the PIC's dismissal of Abbott's complaint against then-Chief Disciplinary Counsel.[33] Abbott appealed the Superior Court's decision to this Court.

B.

On March 12, 2018, ODC filed a petition for Abbott's immediate interim suspension pending final disposition of the disciplinary proceeding. ODC alleged that Abbott's false and frivolous filings in this proceeding and other venues had interfered with ODC's disciplinary efforts and caused ODC

---

[33] *Abbott v. Del. State Pub. Integrity Comm'n*, 2018 WL 1110852, at *1 (Del. Super. Ct. Feb. 28, 2018).

21

to stay the disciplinary proceeding. On April 13, 2018, this Court held that consideration of the petition for interim suspension should be stayed while the matters forming the basis for the petition remained pending in the Delaware courts.

On February 25, 2019, this Court affirmed the Superior Court's decision in *Abbott v. Del. State Pub. Integrity Comm'n*.[34] On April 11, 2019, ODC, which had new Chief Disciplinary Counsel, moved to withdraw the petition for Abbott's interim suspension. Instead of moving to lift the stay of the petition, ODC had determined to proceed with investigation and, as warranted, proceedings before the PRC and Board. Abbott objected, arguing that the petition should be dismissed. The Court granted the motion to withdraw the petition.

In September 2019, the new Board Chair held a status conference and set a schedule to complete briefing on ODC's July 2016 motion to compel production of Abbott's advice to Jenney regarding the transfer. In his filings with the Board, which included a motion to dismiss, Abbott continued his inappropriate attacks on the Vice Chancellor and mounted one on this Court. For example, Abbott alleged that:

- ODC was acting in bad faith upon "the vindictive urging of the emotionally unhinged Vice Chancellor," the "wild

---

[34] 206 A.3d 260, 2019 WL 937184, at *1 (Del. Feb. 25, 2019) (TABLE).

ravings of the Angry Vice Chancellor," and the "ravings of an unhinged personality (the 'Maniacal Rant')."[35]

- The Maniacal Rant is unsupported by any evidence or legal analysis. It was simply a conclusory harangue of inflammatory buzzwords, which were carefully selected by the Angry Vice Chancellor to manufacture a record to further his diabolical plot to destroy Abbott for purely personal reasons.[36]

- The ODC foolishly relies upon the absurd and completely unfounded assertions of the Angry Vice Chancellor, whose every statement in this matter is inherently unreliable and non-credible based upon his obviously disturbed state of mind and ulterior motive to harm Abbott.[37]

- The Angry Vice Chancellor's extremely poor attitude and inability to think clearly and cogently is evident.[38]

- The Angry Vice Chancellor hoped to ruin Abbott's legal career based on a doctored up record and referral to the ODC.[39]

- If the ODC were to proceed against Abbott, he needs to take discovery from the Angry Vice Chancellor, including: (1) a deposition *ad testificandum* and *duces tecum*; (2) a physical examination through a psychiatrist and/or medical doctor; (3) document production regarding medications and records regarding any medical and/or any psychiatric condition(s).[40]

---

[35] Oct. 4, 2019 Sur-Reply in Opposition to Motion to Compel Lawyer-Client Privileged Documents ¶¶ 1, 5, 14, Ex. 242.
[36] *Id.* ¶ 18 n.9.
[37] *Id.* ¶ 25.
[38] *Id.*
[39] Oct. 4, 2019 Motion to Dismiss ¶ 1, Ex. 243.
[40] Nov. 12, 2019 Reply in Support of Motion to Dismiss ¶ 48, Ex. 122.

- Psychological conditions such as mental transference, delusional episodes, memory lapses, or other disorders that the Angry Vice Chancellor may have suffered in 2015 must be discovered so as to explain why he was unable to competently assess and comment upon Abbott's (appropriate) conduct.[41]

- Disappointingly, the Delaware Supreme Court failed to intervene and promptly discipline the Disgraced Past CDC for her misconduct in that regard [the petition for interim suspension], instead looking a blind eye to corruption that has infected the ODC's dealings in this matter.[42]

- The Supreme Court is simply out to lunch and cannot be expected to exercise any legitimate supervision of the ODC….[43]

On November 14, 2019, the Board Chair granted ODC's motion to compel and denied Abbott's motion to dismiss. On December 9, 2019, the Board Chair denied Abbott's motion for reargument.

On December 16, 2019, ODC notified Abbott that it planned to present a petition for discipline to the PRC on January 8, 2020 for Abbott's violation of Rules 3.4(c), 3.5(d), 8.4(a), and 8.4(d). Abbott requested a postponement of the presentation, to which ODC agreed.

---

[41] *Id.*
[42] Oct. 4, 2019 Motion to Dismiss ¶ 16, Ex. 243.
[43] *Id.* ¶ 17.

On January 2, 2020, Abbott sent a motion to dismiss the disciplinary proceeding to the Justices by Federal Express. Abbott continued to attack the Vice Chancellor and the Court, alleging, among other things:

- The Vice Chancellor hoped to harm Abbott based on a doctored up record and referral to the ODC.[44]

- Disappointingly, the Delaware Supreme Court failed to intervene and promptly discipline the Disgraced Past CDC for her misconduct in that regard [the petition for interim suspension], instead looking a blind eye to the corruption that has infected the ODC's dealings *vis-à-vis* Abbott for lo these many years now.[45]

On January 2, 2020, Abbott also sent PRC members a motion for recusal of any lawyer members who regularly practiced in the Court of Chancery. The motion contained many of the same inappropriate attacks Abbott had made in previous motions.[46] On January 7, 2020, Abbott filed a motion to recuse the Board Chair. On January 14, 2020, ODC notified Abbott that it planned to present a petition for discipline to the PRC on February 5, 2020 for Abbott's violations of Rules 3.4(c), 3.5(d), 8.4(a), 8.4(c), and 8.4(d).

---

[44] Jan. 2, 2020 Motion to Dismiss ¶ 1, Ex. 244.

[45] *Id.* ¶ 26.

[46] *See, e.g.*, Jan. 2, 2020 Motion for Recusal of Certain Members ¶ 12, Ex. 129 ("Rather than congratulating and applauding Abbott for his zealous representation through appropriate and permissible means, the Vice Chancellor's frustration, aggravation, and anger caused him to lose touch with reality. He lashed out at the undersigned counsel and spouted out wildly unsupported statements in an effort to gin-up a record for purposes of this bad faith, personal retribution proceeding.").

On January 27, 2020, Abbott filed an action against all of the then-current Justices,[47] then-Chief Disciplinary Counsel, and Deputy Disciplinary Counsel in the United States District Court for the District of Delaware. Abbott asserted federal RICO and 42 U.S.C. § 1983 claims as well as state law claims based on the disciplinary proceeding. He also filed a motion for a temporary restraining order of the disciplinary proceedings, which the District Court denied. Abbott's complaint and exhibits included allegations about the Vice Chancellor that were similar to the inappropriate attacks in Abbott's filings with the Board and PIC.[48] The District Court ultimately dismissed the federal action based on the *Younger* abstention doctrine.[49] The United States Court of Appeals for the Third Circuit affirmed the District Court's decision.[50]

On January 30, 2020, Abbott asked PRC members to stay their consideration of ODC's petition pending resolution of his recusal motions and federal lawsuit. Abbott also submitted materials, including the January 2,

---

[47] At that time, the Justices were Chief Justice Seitz, Justice Valihura, Justice Vaughn, Justice Traynor, and Justice Montgomery-Reeves.

[48] *See, e.g., Abbott v. Mette*, C.A. No. 1:20-cv-131, Am. Compl. ¶¶ 21–22, 50 (D. Del. Mar. 9, 2020), 2020 WL 3604108 (alleging that the Vice Chancellor "arranged to trump up defamatory and disparaging remarks about Abbott" and had a "purposeful desire to harm Abbott without any factual or legal basis"); Am. Compl. Ex. D at 1, 6 (a letter Abbott submitted to the PRC that referred to an "utterly frivolous complaint by a Vice Chancellor who let his emotions get carried away," "[t]he subjective personal opinion of a Vice Chancellor stated in conclusory hyperbole is nothing more than a judicial rant," and the Vice Chancellor "hijack[ing] the lawyer disciplinary system to mete out his personal dislike of my litigation approach.").

[49] *Abbott v. Mette*, 2021 WL 1168958, at *4–5 (D. Del. Mar. 26, 2021).

[50] *Abbott v. Mette*, 2021 WL 5906146, at *1 (3d Cir. Dec. 14, 2021).

26

2020 Motion to Dismiss that attacked the Vice Chancellor and this Court, for the February 5, 2020 PRC hearing that were provided to the PRC panel.

C.

After the filing of the disciplinary petition, Abbott sought discovery and continued to assert claims relating to the disciplinary proceeding in other venues.

1.

On February 5, 2020, the PRC panel determined that there was probable cause that Abbott engaged in professional misconduct and recommended the filing of ODC's petition for discipline ("Petition"). The Petition asserted the following counts:

> Count I—violation of Rule 3.4(c) based on Abbott knowingly advising and assisting Jenney to disobey the Consent Order;
>
> Count II—violation of Rule 8.4(a) based on Abbott's violation or attempted violation of Rule 3.4(c) and/or doing so through the acts of another;
>
> Count III—violation of Rule 8.4(c) based on Abbott making affirmative statements to the Court of Chancery and Seabreeze's counsel, including but not limited to statements in his March 16, 2015 Letter, that were contrary to his legal strategy, advice to Jenney, and understanding of the facts and law;
>
> Count IV—violation of Rule 3.5(d) based on Abbott making degrading statements about the Vice Chancellor and this Court in submissions to the Board, the PIC, and/or this Court; and

27

Count V—violation of Rule 8.4(d) based on the misconduct alleged in Counts I-IV.

On July 1, 2020, Abbott filed an Answer to the Petition and asserted 96 affirmative defenses. Later that month, he obtained subpoenas for depositions of the Justices, then-Chief Disciplinary Counsel, Deputy Disciplinary Counsel, and former Chief Disciplinary Counsel. He also obtained subpoenas for a deposition of the Vice Chancellor and production of his medical records as well as a deposition of the former Chief Justice and production of his records concerning Abbott's Court on the Judiciary complaint. The recipients moved to quash the subpoenas. Abbott withdrew the subpoenas before the Board Chair could resolve the motions to quash.

On September 14, 2020, the Board Administrative Assistant appointed the Panel and issued a notice of hearing for December 10, 2020. On September 18, 2020, Abbott moved to recuse the Panel Chair based on his legal practice in the Court of Chancery. He also advocated for holding the schedule in abeyance until the motion for recusal was decided.

At an October 5, 2020 status conference and in a subsequent written decision, the Panel Chair denied the motion for recusal, stating that he had retired in March 2018 and had not appeared in the Court of Chancery since then. As to scheduling, Abbott sought a year to take discovery and to litigate the matter while ODC sought to maintain the December 10, 2020 hearing date.

The Panel Chair rejected ODC's position and ultimately set a schedule for Abbott to seek discovery subpoenas and for briefing on expected motions to quash.

In October 2020, Abbott again obtained subpoenas for depositions of the Justices, then-Chief Disciplinary counsel, Deputy Disciplinary Counsel, and former Chief Disciplinary Counsel. He again obtained subpoenas for a deposition of the Vice Chancellor and production of his medical records and a deposition of the former Chief Justice and production of his records concerning Abbott's Court on the Judiciary complaint. He also obtained a subpoena for a deposition and documents of ODC's records custodian and the Board Administrative Assistant. The subpoena recipients filed motions to quash, which the Panel Chair granted in a 118-page decision in February 2021. Abbott filed that decision in the District Court litigation.

On January 18, 2021, Abbott filed another motion for recusal of the Panel Chair. The Panel Chair denied the motion. Abbott filed motions for reargument of the Panel Chair's decisions on the motions to quash and motion for recusal, which the Panel Chair denied.

On May 10, 2021, the Panel Chair entered an order scheduling the portion of the disciplinary hearing on whether Abbott violated the DLRPC for November 8, 2021 to November 12, 2021. The scheduling order also

established deadlines for expert reports, discovery, and motions *in limine*. The Panel Chair denied Abbott's subsequent request to extend the dates and later motion to postpone the November 8, 2021 hearing.

2.

On May 10, 2021, Abbott filed an action in the Court of Chancery against the Justices and ODC counsel. Abbott asserted claims similar to the claims he had asserted in his federal action. At the Court of Chancery's request, the Chief Justice designated a Superior Court judge to sit as Vice Chancellor under Article IV, §13(2) of the Delaware Constitution. The Court of Chancery denied Abbott's motions for a temporary restraining order and expedition, and ultimately dismissed Abbott's complaint based on this Court's exclusive authority in disciplinary proceedings.[51] A panel of Justices designated under Article IV, §§ 12 and 38 of the Delaware Constitution affirmed the Court of Chancery's decisions.[52]

On May 11, 2021, Abbott obtained interrogatory subpoenas for the Justices, the Vice Chancellor, the Board Administrative Assistant, the Clerk of this Court, ODC, and former Chief Disciplinary Counsel. The recipients

---

[51] *Abbott v. Vavala*, 2022 WL 453609, at *3, 13 (Del. Ch. Feb. 15, 2022).
[52] *Abbott v. Vavala*, 284 A.3d 77, 2022 WL 3642947, at *7 (Del. Aug. 22, 2022) (TABLE).

30

filed motions to quash the interrogatory subpoenas, which the Panel Chair granted.

To protect the effective functioning of the disciplinary process, this Court enjoined Abbott, on May 18, 2021, from serving or filing any new complaints or actions in State courts or with the Court on the Judiciary, ODC, or any State administrative board arising out of or relating to this disciplinary proceeding ("May 18, 2021 Order").[53] The Court also stayed any pending complaints Abbott had filed against present or former ODC attorneys and stated that any objections to the conduct of the ODC attorneys or the Panel would be considered when the Court reviewed the Panel's report and recommendations. In late 2021, Abbott sought partial relief from the May 18, 2021 Order, stating that he wished to pursue disqualification and discipline against the Panel Chair. On January 19, 2022, the Court denied the motion, noting that it had already ruled it would consider any objections concerning the Panel, which included the Panel Chair, when it reviewed the Panel's final report and recommendations.

Throughout the summer and fall of 2021, ODC and Abbott litigated motions *in limine* and Abbott's motion to quash ODC's second subpoena directed to him. In October 2021, Abbott obtained subpoenas for the

---

[53] *In re Abbott*, 267 A.3d 995, 2021 WL 1996927 (Del. May 18, 2021) (TABLE).

appearances of the Justices, the former Chief Justice, the Vice Chancellor, former Chief Disciplinary Counsel, Deputy Disciplinary Counsel, the Board Chair, the Board Administrative Assistant, the ODC records custodian, and three Court of Chancery employees at the November 2021 hearing. The recipients moved to quash the subpoenas.

On October 25, 2021, Abbott moved to postpone the November hearing. He argued, among other things, that the Panel Chair lacked authority to resolve the motions to quash. ODC opposed the motion. On October 28, 2021, Abbott filed an emergency petition with this Court for enforcement of his subpoenas. On November 1, 2021, the Panel Chair denied Abbott's motion for postponement. Abbott filed a motion for reargument, which the Panel Chair denied. On November 2, 2021, the Court denied Abbott's emergency petition.[54]

3.

At the November 2021 hearing, which stretched from the originally scheduled five days to seven days, the Panel heard testimony from Seabreeze's counsel, Jenney, and Abbott, as a fact witness and an expert witness. After the hearing, ODC and Abbott submitted briefing and exhibits in support of their positions.

_____

[54] The Court issued a lengthier decision with its reasoning on January 19, 2022.

On July 11, 2022, the Panel issued its report and recommendations regarding whether Abbott had violated the DLRPC. As to Rule 3.4(c), the Panel concluded that ODC did not establish by clear and convincing evidence that Abbott had caused the violation of a court order issued under the Court of Chancery Rules. Although the Panel described this as a "close issue" and Abbott's advice to Jenney as "contrary to the spirit of Rule 3.4(c),"[55] the Panel found that, as of March 16, 2015, there was no violation of a court order because the then-current March 3, 2015 Bench Rulings did not require Jenney to complete trimming of the trees and shrubs until April 22, 2015.

Turning to Rule 8.4(a), the Panel found that ODC satisfied its burden of showing that Abbott attempted to cause Jenney to disobey the terms of the Consent Order and March 3, 2015 Bench Rulings by executing the transfer of the Properties. The Panel also found, however, that the Rule 3.4(c) "open refusal" exception applied to Rule 8.4(a) and the March 16, 2015 Letter satisfied this exception, notwithstanding certain misrepresentations in that letter. As a result, the Panel concluded that ODC had not established a violation of Rule 8.4(a) by clear and convincing evidence.

The Panel next determined that there was clear and convincing evidence that Abbott had violated Rule 8.4(c) by making misrepresentations

---

[55] July 11, 2022 Panel Recommendation at 91.

in the March 16, 2015 Letter. Specifically, Abbott misrepresented that Jenney no longer had any ownership interest in the Properties and that Jenney's obligations under the Settlement Agreement were purely *in personam* without mentioning the expansion of Jenney's obligations to his successors and assigns under the Consent Order.

The Panel also held that there was clear and convincing evidence that Abbott violated Rule 3.5(d) by making improper statements about the Vice Chancellor in submissions to the Board, PIC, and this Court and by making improper statements about the Court in filings with the Board and the Court.

As to Rule 8.4(d), the Panel concluded that there was clear and convincing evidence that Abbott engaged in conduct prejudicial to the administration of justice by making misrepresentations in the March 16, 2015 Letter and by repeatedly making statements that were degrading to a tribunal.

Finally, the Panel addressed and rejected Abbott's arguments concerning subject matter jurisdiction, the statute of limitations, laches, attorney-client privilege, Due Process, the Confrontation Clause, Equal Protection, prosecutorial misconduct, and RICO.

4.

The Panel Chair set the sanctions hearing for August 24, 2022, scheduled a pre-hearing conference for August 17, 2022, and directed the

parties to submit pre-hearing submissions by August 11, 2022. The Panel Chair denied Abbott's motions for an extension of the time to file a motion for partial reargument of the Panel's report and recommendations, partial reargument, and an extension of the sanctions hearing.

In August, Abbott obtained subpoenas for the appearances of the Justices, three former Justices who were members of the Court that imposed discipline upon him in 2007,[56] the Vice Chancellor, current and former ODC counsel, current and former Board Chairs, and the Board Administrative Assistant at the August 24, 2022 hearing. The recipients moved to quash those subpoenas. The Panel Chair granted the motions to quash. Abbott also obtained a subpoena for the Panel Chair to testify at the August 24, 2022 hearing. ODC objected and the Panel Chair concluded that he would not be called to testify.

The Panel held the sanctions hearing on August 24, 2022. The Panel heard testimony from Abbott, his wife, two of Abbott's clients, and a Delaware lawyer who had positive working experiences with Abbott. Abbott argued for a minor sanction such as a private admonition, while ODC sought, at a minimum, a three-year suspension with conditions. The parties engaged in post-hearing briefing and motion practice.

---

[56] *In re Abbott*, 925 A.2d 482, 489 (Del. 2007).

On January 23, 2023, the Panel issued its report and recommendations on sanctions. The Panel issued a revised report on January 25, 2023. The Panel Majority recommended a two-year suspension. The Panel Chair recommended disbarment.

Applying the factors set forth in the ABA Standards for Imposing Lawyer Sanctions ("ABA Standards"), as approved in February 1986 and as amended in February 1992, the Panel found that Abbott's misrepresentations in his March 16, 2015 Letter violated Rules 8.4(c) and (d), which constituted breaches of a lawyer's duty to the public (ABA Standard 5.0) and the legal system (ABA Standard 6.0). The Panel further found that Abbott's mental state was intentional and knowing. The Panel Majority concluded that Abbott's knowing misconduct caused actual and potential injury to the public, the legal system, and the profession. The Panel Chair concluded that Abbott's misrepresentations caused serious and potentially even greater serious injury to Seabreeze and a significant adverse impact and potentially even more serious adverse impact on the Seabreeze Litigation. The Panel Majority found that Abbott's misrepresentations adversely reflected on his fitness to practice while the Panel Chair found that Abbott's misrepresentations seriously adversely reflected on his fitness to practice.

36

The Panel determined that the degrading statements, which violated Rules 3.5(d) and 8.4(d), constituted breaches of a lawyer's duty to the public (ABA Standard 6.0) and legal profession (ABA Standard 7.0). The Panel also found that the statements caused potential injury to the public, to the legal system, and to the profession.

The Panel next considered the presumptive sanction. For the misrepresentations in the March 16, 2015 Letter, the Panel Majority found that Standards 5.13 and 6.12 were most applicable and provided collectively for a presumptive sanction of suspension. The Panel Chair found that Standards 5.11(b) and 6.11 were most applicable and provided for a presumptive sanction of disbarment. For the degrading statements, the Panel agreed that Standard 8.2 was most applicable and provided for a presumptive sanction of suspension.

Finally, the Panel considered the aggravating and mitigating factors to determine the appropriate sanction. The Panel Majority found that the aggravating factors outweighed the mitigating factors, but did not warrant enhanced sanctions in a matter that ultimately arose from a dispute over trees and shrubs and was similar to matters where attorneys were suspended. The Panel Chair found that the aggravating factors and lack of mitigating factors provided for enhanced sanctions, but it was not possible to increase the

presumptive sanction of disbarment. If disbarment was not already a presumptive sanction for the Properties transfer misrepresentations, the Panel Chair stated that he would likely recommend a three-year suspension for the degrading statements.

### III.

### A.

On January 24, 2023, the Supreme Court Clerk docketed the Panel's reports and recommendations in *In re Abbott*, No. 25, 2023. Abbott sought an extension of the 20-day deadline for the parties to file objections. Noting that this matter had been pending for eight years and stating that there was no hurry, Abbott proposed having 60 days to file objections to the Panel's first report and then another 60 days to file objections to the Panel's second report. He also lodged a motion for recusal of all of the Justices. ODC objected to the schedule proposed by Abbott.

On February 9, 2023, the Court granted in part and denied in part Abbott's motion for an extension. The Court ordered the parties to submit objections of no more than 15,000 words to both reports by March 15, 2023, responses of no more than 15,000 words to the other party's objections by April 14, 2023, and replies of no more than 8,000 words by May 1, 2023. Abbott filed a motion for reargument, which the Court denied.

Abbott purported to serve subpoenas on the Court Clerk, the Board Administrative Assistant, ODC, and current and former ODC counsel for documents he had sought in the Board proceedings. This Court struck the subpoenas as unauthorized by the DLRDP and the Supreme Court Rules and directed that Abbott not serve or file any additional discovery requests in No. 25, 2023.

On March 15, 2023, ODC and Abbott filed objections to the Panel's reports. Abbott's objections were 229 pages long, significantly exceeding the 15,000 word-count limit ordered by the Court. The Court struck the objections and directed Abbott to file objections of no more than 15,000 words, along with a Rule 13(a) certificate of compliance, by March 17, 2023. Abbott, who said he was on vacation March 16 and March 17, 2023, informed the Clerk on March 20th that if the Court did not identify which objections to shorten or delete by March 22nd, he would involuntarily decide what to cut. On March 22, 2023, Abbott filed 72 pages of objections, or 14,978 words according to his certificate of compliance.

On April 12, 2023, Chief Justice Seitz, Justice Vaughn, and Justice Traynor denied the motion for their recusals. Justice Valihura recused herself. Abbott filed a motion for reargument, which the Court denied. This matter was submitted for decision on June 28, 2023.

B.

ODC's objections may be summarized as follows: (i) the Panel erred as a matter of law by not finding clear and convincing evidence that Abbott violated Rules 3.4(c), 8.4(a), and 8.4(d) when he counseled and assisted Jenney to disobey a court order and bench ruling; (ii) the Panel abused its discretion in qualifying Abbott as an expert witness; and (iii) the Panel erred as a matter of law when it misapplied the aggravating factors to the presumptive sanction.

Without considering the objections Abbott improperly incorporated by reference,[57] Abbott's objections may be summarized as follows: (i) ODC failed to prove by clear and convincing evidence that he violated Rules 3.4(c), 3.5(d), 8.4(a), 8.4(c), and 8.4(d); (ii) the Vice Chancellor, the Panel Chair, and ODC attorneys committed misconduct; (iii) the statute of limitations and laches barred ODC's claims; (iv) there were violations of Abbott's rights

---

[57] Supr. Ct. R. 14; *Ploof v. State*, 75 A.3d 811, 822–23 (Del. 2013). These objections may include claims for violations of federal civil and Delaware RICO statutes that Abbott raised in his federal and Court of Chancery complaints. Both this Court and the District Court held that Abbott could raise the substance of these claims in the disciplinary proceeding. *Abbott*, 2022 WL 3642947, at *3; *Abbott*, 2021 WL 1168958, at *2. The Panel considered the facts underlying Abbott's RICO claims, which were based on essentially the same factual allegations and defenses as in the disciplinary proceeding, and concluded that Abbott had not shown any professional or judicial misconduct or constitutional violations. Abbott has not properly asserted any objections to the Panel's handling of his RICO claims and has therefore waived those claims.

under the First, Sixth, and Fourteenth Amendments of the United States Constitution; and (v) the Panel misapplied the ABA Standards and Delaware disciplinary cases in recommending a sanction.[58]

## IV.

This Court has the "'inherent and exclusive authority' to discipline members of the Delaware Bar."[59] Although the Panel's recommendations are helpful, the Court is not bound by them.[60] The Court has an obligation to review the record independently and to determine whether there is substantial evidence to support the Panel's factual findings.[61] The Court reviews the Panel's conclusions of law *de novo*.[62]

## A.

## 1.

ODC contends that the Panel erred in failing to find that Abbott violated Rule 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal) by advising and assisting Jenney to disobey the Consent Order and March 3, 2015 Bench Rulings. The source of this error, according to ODC, was the

---

[58] The Court has considered these objections notwithstanding Abbott's flagrant violation of its Feb. 9, 2023 order establishing the word count limits and deadlines for the objections.
[59] *In re Froelich*, 838 A.2d 1117, 1120 (Del. 2003) (citing *In re Benson*, 774 A.2d 258, 262 (Del. 2001)).
[60] *In re Nadel*, 82 A.3d 716, 720 (Del. 2013).
[61] *Abbott*, 925 A.2d at 484.
[62] *Id.*

Panel's reliance on the April 22, 2015 deadline established in the March 3, 2015 Bench Rulings for the trimming of the trees and shrubs. The Panel reasoned that there was no violation of Rule 3.4(c) because, as of March 16, 2015 the deadline for Jenney to trim the trees and shrubs had not yet passed and thus there was no disobedience of a court order. Abbott argues that ODC failed to prove by clear and convincing evidence that he violated Rule 3.4(c).

We must independently review the record to determine if there is clear and convincing evidence to support a finding of knowing misconduct.[63] "Clear and convincing evidence is evidence that produces an abiding conviction that the truth of the contention is 'highly probable.'"[64]

Having considered the evidence presented, the Panel's report and recommendations, and the parties' positions, we conclude that ODC established, by clear and convincing evidence, that Abbott violated Rule 3.4(c) when he advised and assisted Jenney to disobey the Consent Order and March 3, 2015 Bench Rulings by transferring the Properties to his wife for nominal consideration while maintaining his control of the Properties. The Panel's reliance on the April 22, 2015 deadline established in the March 3, 2015 Bench Rulings to find otherwise was misplaced. Although the April 22,

---

[63] *In re Koyste*, 111 A.3d 581, 588 (Del. 2015).
[64] *In re Bailey*, 821 A.2d 851, 863 (Del. 2003).

42

2015 deadline had not passed at the time of Abbott's March 16, 2015 Letter, Jenney was obligated under the Consent Order and March 3, 2015 Bench Rulings to trim the trees and shrubs on the Properties. Contrary to Abbott's suggestion, the passing of the October 31, 2014 deadline for Jenney's completion of the trimming work under the Consent Order did not mean that Jenney was no longer obligated to perform that work. The Consent Order still contained a time-is-of-the-essence provision. The March 3, 2015 Bench Rulings also required Jenney to trim the trees and shrubs on the Properties.

Through the transfer of the Properties, Abbott intended to make Jenney's compliance with his obligations under the Consent Order and the March 3, 2015 Bench Rulings impossible, even though the April 22, 2015 deadline had not yet passed. The evidence clearly establishes that this was the intended purpose of the transfer. As Abbott advised Jenney, "you are no longer the title owner AND the Settlement Agreement and Consent Order are purely personal obligations of yours that it would then be impossible for you to perform."[65] Jenney admitted that he transferred the Properties as advised by Abbott so that he would not have to comply with the court orders.[66] Abbott intentionally designed the transfer to end the Seabreeze Litigation and to force

---

[65] Mar. 7, 2015 Email, Ex. 236.
[66] *See supra* Section I.D.

43

Seabreeze to start over, thereby depriving Seabreeze of its rights under the Consent Order and March 3, 2015 Bench Rulings.[67]  The Court of Chancery's prompt action to ensure that this did not happen as Abbott intended does not erase Abbott's violation of Rule 3.4(c).

It is also clear that Abbott acted knowingly.  Under the DLRPC, an attorney acts "knowingly" when he has "actual knowledge of the fact in question."[68]  An attorney's "knowledge may be inferred from circumstances."[69]  Abbott was well-aware of Jenney's obligation to the trim the trees and shrubs on the Properties under the Consent Order and March 3, 2015 Bench Rulings.[70]  He knew that Jenney did not want to comply with those obligations and that Seabreeze was insistent that those obligations be performed soon.[71]  Abbott knowingly devised and executed the plan for Jenney to disobey his obligations under the Consent Order and March 3, 2015 Bench Rulings by transferring the Properties to his wife for nominal consideration.[72]

Abbott contends that Rule 3.4(c) applies only to "an obligation under the rules of a tribunal," not a court ruling like the Consent Order or March 3,

---

[67] *See supra* Sections I.C., I.D.
[68] DLRPC R. 1.0(f).
[69] *Id*.
[70] *See supra* Sections I.B., I.C., I.D.
[71] *See id.*
[72] *See supra* Sections I.C., I.D.

2015 Bench Rulings, and that he did not disobey any obligations he had under the Court of Chancery Rules. In making this argument, Abbott points out that the predecessor to Rule 3.4(c) in Delaware included the word "ruling" and that other States' ethical rules expressly provide that a lawyer may not disobey a ruling. This interpretation of Rule 3.4(c) is contrary to our disciplinary cases, disciplinary cases in other jurisdictions, and the ABA Standards.[73]

Abbott also argues that he could not have violated Rule 3.4(c) because he was not subject to the Consent Order or the March 3, 2015 Bench Rulings. We reject this argument. An attorney may object to a court's ruling and preserve a claim of error, but may not "advise a client not to comply" with the court's ruling.[74] This Court has previously found attorneys violated Rule 3.4(c) when they assisted someone other than themselves subject to a court

---

[73] *See, e.g.*, *In re Woods*, 143 A.3d 1223, 1226 (Del. 2016) (describing failure to comply with the terms of a court order as a violation of Rule 3.4(c)); *In re Tonwe*, 929 A.2d 774, 778 (Del. 2007) (lawyer knowingly violated Rule 3.4(c) by flouting an order to cease and desist unauthorized practice); *In re Shearin*, 765 A.2d 930, 937 (Del. 2000) (holding that an attorney violated Rule 3.4(c) when she disobeyed a court order that enjoined her and her client from interfering with another party's title to certain property and from holding themselves out as having an ownership interest in the properties); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Baldwin*, 857 N.W.2d 195, 211 (Iowa 2014) (recognizing that this rule applies to court orders and rules); ABA Standards 6.2 (including court orders in discussing sanctions for failure to obey any obligation under the rules of the tribunal).

[74] *Maness v. Meyers*, 419 U.S. 449, 458 (1975). *See also In re Ford*, 128 P.3d 178, 182 (Alaska 2006) ("An attorney may challenge a court order by motion, appeal, or other legal means, but may not simply disregard it."); Restatement (Third) of the Law Governing Lawyers § 94(2) (Am. Law Inst. 2000) (providing that lawyer may not assist a client in conduct that violates a court order unless the lawyer reasonably believes the conduct constitutes a good faith effort to determine the scope of a court order or that the client can assert a non-frivolous argument that the conduct will not violate a court order).

order to disobey that court order.[75]  Other courts have also found Rule 3.4(c)

violations when a lawyer knowingly advised or assisted a client to disobey a

court order.[76]

Although Abbott correctly points out that neither the Consent Order nor

the March 3, 2015 Bench Rulings prohibited Jenney from transferring the

Properties, he ignores that those orders required Jenney to trim the trees and

shrubs on the Properties.  So while Jenney did not disobey a court order

prohibiting transfer of the Properties, he did disobey a court order requiring

him to trim the trees and shrubs on the Properties.

Finally, Rule 3.4(c) makes an exception for "open refusal based on an

assertion that no valid obligation exists."  This exception is inapplicable here

because there was no open refusal before the transfer of the Properties.

Although Abbott stated that he had considered whether there was a viable

---

[75] *In re Martin*, 105 A.3d 967, 971–72, 975 (Del. 2014) (concluding that there was clear and convincing evidence that attorney violated Rule 3.4(c) by assisting suspended attorney in his practice of law in violation of the order suspending the attorney); *In re Kingsley*, 950 A.2d 659, 2008 WL 2310289, at *4-5 (Del. June 4, 2008) (TABLE) (disbarring non-Delaware attorney whose failure to respond to ODC's petition was deemed an admission of, among other things, the allegation that he violated Rule 3.4(c) by performing legal work for an accountant after the accountant was subject to a cease and desist order not to engage in the unauthorized practice of law).

[76] *See, e.g.*, *In re McCarthy*, 668 N.E.2d 256, 258 (Ind. 1996) (holding that attorney violated Rule 3.4(c) by preparing a quitclaim deed conveying marital property in violation of a restraining order against his client); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Vandel*, 889 N.W.2d 659, 666–67 (Iowa 2017) (concluding that there was Rule 3.4(c) violation where attorney failed to answer disciplinary petition and therefore admitted allegation that she advised her client to deny visitation to her ex-husband despite visitation schedule in dissolution decree).

Court of Chancery Rule 60(b) motion in the January 8, 2015 response to Seabreeze's notice to show cause, he went on to state that Jenney would have the trimming work performed. At the January 15, February 23, and March 3, 2015 hearings, Abbott continued to represent that Jenney was taking the necessary steps to complete the trimming work, not that Jenney had no obligation or intention to do so.

2.

ODC also objects to the Panel's failure to find that Abbott violated Rule 8.4(a) (violating or attempting to violate the Rules of Professional Conduct or knowingly assisting another to do so) by violating the Consent Order and March 3, 2015 Bench Rulings directly, inducing Jenney to violate those orders, and directing his non-lawyer assistant to assist in violating the orders by drafting, notarizing, and recording the deeds. The Panel, again relying on the April 22, 2015 trimming deadline, concluded that ODC had not shown that Abbott violated Rule 8.4(a) by procuring violation of the Consent Order. As previously discussed, the Panel's reliance on the April 22, 20215 deadline was misplaced.

ODC also argued that Abbott attempted to cause Jenney to disobey the Consent Order and March 3, 2015 Bench Rulings by transferring the Properties to his wife. The Panel agreed, but found that the "open refusal"

47

exception of Rule 3.4(c) applies to Rule 8.4(a) and that Abbott's March 16, 2015 Letter constituted an "open refusal" because the April 22, 2015 trimming deadline had not passed. Again, the Panel's reliance on the April 22, 2015 deadline was misplaced.

Abbott argues that Rule 8.4(a) only applies to attorneys who assist or induce other attorneys to violate the DLRPC, but this interpretation of Rule 8.4(a) is incorrect.[77] ODC has shown by clear and convincing evidence that Abbott violated Rule 8.4(a).

3.

Abbott objects to the Panel's conclusion that there was clear and convincing evidence he violated Rule 8.4(c) (engaging in conduct involving dishonest, fraud, deceit or misrepresentation) by making two material misrepresentations in his March 16, 2015 Letter. The Panel found that Abbott violated Rule 8.4(c) by misrepresenting to the Court of Chancery that: (i) Jenney no longer had any ownership interest in the Properties, even though Jenney continued to hold *de facto* ownership rights in the Properties and intended to reconvey title back to himself; and (ii) stating that Jenney's

---

[77] *In re Davis*, 974 A.2d 170, 175 (Del. 2009) (holding lawyer violated Rule 8.4(a) by causing staff members to notarize documents when the lawyer did not sign the documents in the notary's presence); *State v. Grossberg*, 705 A.2d 608, 612–13 (Del. Super. Ct. 1997) (revoking attorney's *pro hac* admission after he gave statements violating court order and Rule 3.6 and arranged for his client and parents to do interviews during which they made statements that he could not have made under Rule 3.6).

48

obligations under the Settlement Agreement were purely *in personam* without disclosing the provisions of Paragraph 17 in the Consent Order.

Abbott contends that these statements were omissions, not affirmative statements as required for violation of Rule 8.4(c). This Court, however, has found that a lawyer's incomplete or misleading statements to a court violate Rule 8.4(c).[78] In addition, Abbott contends that the Petition pleaded affirmative misrepresentations, not misrepresentations by omission. Count III of the Petition alleged that "[b]y making affirmative statements to the Court and opposing counsel, including but not limited to statements [in the March 16, 2015 Letter] . . . that were contrary to Respondent's legal strategy, Respondent's advice to his client and/or Respondent's understanding of the facts and law, Respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of Rule 8.4(c))." The Petition sufficiently pleaded, and put Abbott on notice of, the basis for the alleged Rule 8.4(c) violation.

---

[78] *See, e.g.*, *In re Favata*, 119 A.3d 1283, 1287-90 (Del. 2015) (finding Rule 8.4(c) violations where lawyer made statements that he intended the defendant to overhear, told the trial judge that he was not communicating with the defendant, and failed to correct those false statements); *In re Poliquin*, 49 A.3d 1115, 1133 (Del. 2012) (finding Rule 8.4(c) violations where lawyer failed to disclose a previous admonition and failed to correct his counsel's statements that he had performed within expectations of the judicial system since admission to the Bar at a rule to show cause hearing).

Abbott also argues that his statements in the March 16, 2015 Letter were factually and legally accurate. This argument is without merit. Abbott advised the Court that Jenney no longer had any ownership interest in the Properties, even though he knew that the only purpose of the transfer was for Jenney to avoid his trimming obligations and he had advised Jenney that he could have his wife transfer the Properties back to him in the future. Abbott claims that he did not know who would control the Properties after the transfer, but again, he had advised Jenney that he could transfer the Properties back to himself in the future. This advice reflects that Abbott knew Jenney, not his wife, would control what happened to the Properties after the transfer. Even if we accepted Abbott's claim that he did not know Jenney would continue to exercise ownership rights over the Properties after the transfer, he made no effort to determine who would actually be in control of the Properties after the transfer. Other than a March 9, 2015 email in which Jenney's wife authorized transfer of the Properties to her, Abbott had no communications with her about what she knew or had in mind regarding the transfer or plans for the Properties after the transfer. As the Panel recognized, "[o]nce a plan is provided and initiated, a lawyer cannot then stick his head in the sand like an ostrich and claim that he was unaware of the exact methods of his client's

execution of the plan."[79]  Nor may lawyers "stick their heads in the sand and blind themselves to their professional obligations."[80]

Abbott further contends that he was not required to mention the Consent Order in the March 16, 2015 Letter because he did not believe it remained in effect.  Abbott, however, had advised Jenney that Paragraph 17 of the Consent Order expanded his obligation to trim the trees and shrubs to his successors, heirs, and assigns and that Seabreeze would rely on that language to challenge the transfer.  As discussed by the Panel, Abbott referred to the Consent Order in an earlier draft of the March 16, 2015 Letter, but removed that reference from the final version submitted to the Court of Chancery.  It is clear that Abbott deliberately and strategically chose not to mention the Consent Order in the March 16, 2015 Letter.

Finally, Abbott contends that ODC failed to prove the fourth and fifth elements of common law fraud (reliance upon and damage from the misrepresentations) as required by this Court in *In re Lyle*[81] for a violation of Rule 8.4(c).  Abbott misreads *Lyle*.  In that case, the Court concluded that a public defender who shared a co-defendant's privileged statement with his client did not violate Rule 8.4(c).  The Court found that the attorney's conduct

---

[79] July 11, 2022 Panel Recommendation at 28 n.79.
[80] *In re Beauregard*, 189 A.3d 1236, 1251 (Del. 2018).
[81] 74 A.3d 654, 2013 WL 4543284, at *8 (Del. Aug. 23, 2013) (TABLE).

was "qualitatively distinguishable" from the conduct of attorneys in cases where it found Rule 8.4(c) violations.[82] The Court approved the Panel's report, which reviewed the elements of common law fraud before finding that the attorney had not deceived anyone or made any false representations, but neither the Court nor the Board held that a Rule 8.4(c) violation requires proof of reliance and damages. ODC proved by clear and convincing evidence that Abbott violated Rule 8.4(c) by making misrepresentations in his March 16, 2015 Letter.

4.

Abbott asserts several objections to the Panel's finding that he violated Rule 3.5(d) (conduct degrading to a tribunal) by making statements degrading to the Vice Chancellor and the Court in submissions to the Board, PIC, and the Court. As discussed by the Panel, this Court has found violations of Rule 3.5(d) (or its predecessor, 3.5(c)) where attorneys: (i) accused a tribunal of reaching decisions based on bias, prejudice, or improper motivations, rather than on the merits;[83] and (ii) used personal and inflammatory language to

---

[82] *Id.* at *2.

[83] *Abbott*, 925 A.2d at 486 (holding that attorney violated Rule 3.5(d) by suggesting in a reply brief that the judge would rule on a basis other than the merits of the case); *In re Ramunno*, 625 A.2d 248, 250 (Del. 1993) (finding that attorney violated Rule 3.5(c) when he "engaged in an insolent colloquy with the trial judge . . . which, implicitly if not explicitly challenged the court's integrity" and stating that disparagement of a court's integrity is "unacceptable by any standard").

attack opposing counsel or the tribunal.[84]  Consistent with this precedent, the Panel found that there was clear and convincing evidence that Abbott had violated Rule 3.5(d) by making statements in submissions to the Board, PIC, and this Court that the Vice Chancellor fabricated the record and reached decisions based on mental instability or  personal dislike of Abbott instead of the merits.  The Panel also found that there was clear and convincing evidence that Abbott violated Rule 3.5(d) by making statements in submissions to the Board and this Court that this Court was turning a blind eye to corruption in the ODC.

Abbott does not dispute that he made the statements, but contends that he did not violate Rule 3.5(d) because: (i) he was acting as a *pro se* litigant, not a lawyer, when he made the statements; (ii) the Board and PIC are not tribunals under Rule 3.5(d); (iii) his statements could not be degrading to a tribunal because the Vice Chancellor and this Court were unaware of the

---

[84] *Abbott*, 925 A.2d at 484-85 (concluding that attorney's statements in Superior Court briefs referring, among other things, to opposing counsel's "fictionalized" account of a hearing, the tribunal's "imaginary, make-believe set of reasons" for its findings, and appointment of "a group of monkeys" to the tribunal violated Rule 3.5(d)); *In re Shearin*, 721 A.2d 157, 162, 165 (Del. 1998) (finding Rule 3.5(c) violation where the attorney suggested in appellate reply brief that there were rumors the Vice Chancellor had been bribed by the opposing party).  *See also In re Johnston*, 520 P.3d 737, 779, 792 (Kan. 2022) (finding attorney violated Rule 3.5(d) where she, among other things, accused court, bar, and others of engaging in collusion and racketeering without providing any evidence and accused judge who directed her to self-report to disciplinary authority as acting so contrary to the record that the allegations had appearance of retaliatory harassment).

53

statements; (iv) he made the statements in confidential proceedings and his statements should be immune from discipline; and (v) his statements are protected by the First Amendment. These objections are without merit.

Acting *pro se* does not exempt an attorney from the DLRPC. DLRDP 7(a) provides that "[i]t shall be grounds for disciplinary action for a lawyer to . . . [v]iolate any of the Delaware Lawyers' Rules of Professional Conduct . . . whether or not the violation occurred in the course of a lawyer-client relationship." This Court has held that lawyers representing themselves in disciplinary proceedings remain subject to the DLRPC.[85] As the Panel also highlighted, Abbott presented himself as an attorney in many of the submissions containing the degrading statements by including his law firm letterhead, referring to himself as "undersigned counsel," or including his law firm or Esquire signature designations.[86]

---

[85] *In re Hurley*, 183 A.3d 703, 2018 WL 1319010, at *3–5 (Del. Mar. 14, 2018) (TABLE) (accepting Board panel's finding that an attorney violated Rule 4.4(a) (respect for third persons) in his response on behalf of himself to disciplinary complaint); *In re Lankenau*, 158 A.3d 451, 2017 WL 934709, at *1 (Del. Mar. 9, 2017) (TABLE) (accepting Board panel's finding that attorney violated Rule 3.3(a)(1) (candor to tribunal) when he failed to disclose he did not give complete and accurate testimony in previous disciplinary proceeding); *In re Kennedy*, 503 A.2d 1198, 1202, 1208–09 (Del. 1985) (affirming Board panel's finding that attorney who was representing himself in a disciplinary proceeding violated the predecessor to Rule 4.4(a) by threatening the attorney who referred him during the disciplinary proceeding). *See also Barrett v. Va. State Bar ex rel. Second Dist. Comm.* 634 S.E.2d 341, 345 (Va. 2006) ("It would be a manifest absurdity and a distortion of these Rules [of Professional Conduct] if a lawyer representing himself commits an act that violates the Rules but is able to escape accountability for such violation solely because the lawyer is representing himself.").

[86] *See, e.g.,* Exs. 105 at 19–20, 243 at 12, 244 at 17.

Abbott argues that the Board and PIC are not tribunals because they do not fall within the definition of a tribunal under the DLRPC. The DLRPC define a tribunal as:

> [A] court, an arbitrator in a binding arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a binding legal judgment directly affecting a party's interests in a particular matter.[87]

Although the Board's findings are not binding upon this Court, the Board is authorized to make numerous decisions throughout the disciplinary proceedings that bind the parties during those proceedings.[88] For example, "[a]ll discovery orders by the Chair or Vice Chair of the Board or the chair of a Hearing Panel are interlocutory and may not be appealed prior to the Board's submission to the Court of the final report."[89] Like judges of tribunals, Board members do not participate in proceedings "in which a judge, similarly situated, would be required to abstain" under the Delaware Judges' Code of Judicial Conduct.[90] Finally, this Court has treated the Board like a tribunal in

---

[87] DLRPC 1(m).
[88] DLRDP 2(c) (describing the Board's power to conduct hearings and issue orders and the Panel chair's power to decide scheduling, evidentiary, and procedural matters); DLRDP 12(g) (describing powers of Board Chair, Board Vice Chair, and Panel Chair to decide discovery disputes).
[89] DLRDP 12(g).
[90] DLRDP 2(d).

accepting recommendations that a lawyer who made false statements to the Board violated Rule 3.3(a)(1), which prohibits a lawyer from making false statements of fact or law to a tribunal.[91]

Contrary to Abbott's contentions, the PIC is also a tribunal. The PIC's decisions are binding and are subject to limited judicial review.[92]

Abbott next argues that there was no violation of Rule 3.5(d) because the Vice Chancellor and the Court were unaware of his derogatory statements. His understanding of Rule 3.5(d) is flawed. As the Panel stated:

> The text of Rule 3.5(d) does not limit this prohibition of a lawyer's degrading conduct that is aimed only to the tribunal before which the lawyer is then appearing. The underlying policy for Rule 3.5(d) is not to protect the subjective feelings of judiciary members made to them during a proceeding, but to protect the trust and confidence of the judicial system by barring a lawyer's undignified, and discourteous statements about the judiciary.[93]

This Court has affirmed the Board's finding that a lawyer violated the predecessor to Rule 3.5(d) by making "castigating" statements about a Vice Chancellor in her appellate reply brief.[94] Similarly, in *In re Abbott*, this Court discussed and relied upon cases in other jurisdictions where courts found

---

[91] *In re Lankenau*, 2017 WL 934709, at *1; *In re Vanderslice*, 116 A.3d 1244, 2015 WL 3858865, at *1, 9 (Del. June 19, 2015) (TABLE).
[92] 29 *Del. C.* § 5810; 29 *Del. C.* § 5810A.
[93] July 11, 2022 Panel Recommendation at 121.
[94] *In re Shearin*, 721 A.2d at 162.

56

attorneys violated Rule 3.5(d) by making disparaging statements about a lower court's decision.[95]

In addition, Abbott made some of the statements concerning this Court in a motion to dismiss he sent by Federal Express to each of the Justices in January 2020. He claims that there was no violation of Rule 3.5(d) in the absence of proof that the Justices read the motion, but cites no authority in support of the proposition that a document submitted to a tribunal is not degrading unless there is proof that the judicial officer read the degrading statement. Abbott also does not claim that any of the motions were returned to him or otherwise not delivered.

Abbott contends that his statements are protected by confidentiality and immunity provisions in the DLRDP and PIC statute and therefore cannot violate Rule 3.5(d). This contention is unpersuasive. DLRDP 10 provides that all communications to and from the Board, the PRC, or ODC are "absolutely privileged, and no civil suit predicated on these proceedings may be instituted against any complainant, witness or lawyer."[96] This language provides immunity from civil lawsuits, not disciplinary proceedings for ethical violations. "Disciplinary proceedings are neither civil nor criminal,

---

[95] 925 A.2d at 485–87.
[96] DLRDP 10.

but are *sui generis*."[97]   DLRDP 13 provides for confidentiality of certain disciplinary information, but again, does not immunize a lawyer for ethical violations he commits during his disciplinary proceeding.  In fact, this Court has imposed discipline upon attorneys who committed ethical violations during their disciplinary proceedings.[98]  Under Abbott's interpretation of Rule 13, a lawyer could engage in professional misconduct during a disciplinary proceeding by destroying evidence or threatening opposing counsel without suffering any professional consequences.  Such an interpretation is illogical and unreasonable.

As to the PIC statute, § 5810(h)(1) provides that all proceedings relating to a charged violation remain confidential unless the person charged requests public disclosure or the PIC determines after a hearing that a violation occurred.  Section 5810 does not immunize Abbott from any ethical violations he committed in his PIC filings.

Abbott also argues that the absolute litigation privilege protects his statements.  The absolute litigation privilege "is a common law rule, long recognized in Delaware, that protects from actions for defamation statements

---

[97] DLRDP 15(a).

[98] *See, e.g.*, *Hurley*, 2018 WL 1319010, at *3–5 (accepting Board panel's finding that an attorney violated Rule 4.4(a) (respect for third persons) in his response on behalf of himself to disciplinary complaint); *Lankenau*, 2017 WL 934709, at *1 (accepting Board panel's finding that attorney violated Rule 3.3(a)(1) (candor to tribunal) when he failed to disclose he did not give complete and accurate testimony in previous disciplinary proceeding).

of judges, parties, witnesses and attorneys offered in the course of judicial proceedings so long as the party claiming the privilege shows that the statements issued as part of a judicial proceeding and were relevant to a matter at issue in the case."[99] Statements falling under the absolute litigation privilege are privileged "regardless of the tort theory by which the plaintiff seeks to impose liability."[100]

This Court has not extended the absolute litigation privilege to attorney disciplinary proceedings. Other courts have held that the litigation privilege does not insulate an attorney from discipline for unethical conduct.[101]

Abbott relies on *Cohen v. King*[102] to argue that the absolute litigation privilege precludes professional discipline for his statements, but this reliance is misplaced. In *Cohen*, the plaintiff was an attorney who had been the subject of disciplinary proceedings. During the disciplinary proceedings, the plaintiff filed a grievance complaint against the Chief Disciplinary Counsel, who asserted that the complaint was without merit. The complaint was dismissed.

---

[99] *Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992).
[100] *Id.* at 1349.
[101] *See, e.g.*, *Hawkins v. Harris*, 661 A.2d 284, 288 (N.J. 1995) (recognizing that the absolute litigation privilege "does not protect against professional discipline for an attorney's unethical conduct"); *Ruberton v. Gabage*, 654 A.2d 1002, 1007 (N.J. Super. Ct. App. Div. 1995) ("It must be emphasized that the absolute privilege . . . applies to claims of tortious conduct; it does not apply to a claim of unprofessional conduct, or to summary contempt proceedings against the offending attorney.").
[102] 206 A.3d 188 (Conn. App. Ct. 2019).

The plaintiff then filed a lawsuit against the Chief Disciplinary Counsel, alleging that her answer in the disciplinary proceedings contained defamatory statements. The Connecticut court held that the litigation privilege extended absolute immunity to statements made by the respondent to the disciplinary authority and dismissed the complaint. *Cohen* does not stand for the proposition that the litigation privilege insulates Abbott from attorney discipline for his statements.

Finally, Abbott argues that his statements are protected by the First Amendment. The Panel correctly determined that the First Amendment did not protect Abbott's degrading statements. A lawyer's right to free speech is not unlimited. As this Court has observed:

> Based upon the United States Supreme Court's decision in *Gentile*, this Court has held that there are ethical obligations imposed upon a Delaware lawyer, which qualify the lawyer's constitutional right to freedom of speech. Accordingly, members of the Delaware Bar are subject to disciplinary sanctions for speech consisting of intemperate and reckless personal attacks on the integrity of judicial officers.[103]

---

[103] *Shearin*, 765 A.2d at 938 (citations omitted). *See also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1081-82 (1991) (O'Connor, J., concurring) ("Lawyers are officers of the court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech."); *In re Guy*, 756 A.2d 875, 877-79 (Del. 2000) (affirming the Board's conclusion that attorney had violated Rule 8.2, in the course of representing a criminal defendant, based upon his written assertions in a letter to a Superior Court Judge that the Judge acted with racial bias against him).

Abbott relies on cases like *Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of Cal. v. Yagman*[104] to argue that he expressed personal opinions or true statements protected by the First Amendment. But this Court has rejected *Yagman* as inconsistent "with the holdings of the Court on the issue of constitutionally protected speech as applied to lawyers."[105] Instead, this Court has approvingly cited *In re Palmisano*, in which the United States Court of Appeals for the Seventh Circuit held that there must be some factual basis for a lawyer's accusations against a judge before First Amendment protections will apply.[106] There was no factual basis for Abbott's statements that the Vice Chancellor fabricated the basis for Abbott's referral to ODC or acted out of spite or mental instability. Nor is there any factual basis for Abbott's claim that this Court has ignored corruption in the ODC.

Abbott also invokes the *Noerr-Pennington* doctrine, which "provides broad immunity from liability to those who petition the government, including administrative agencies and courts, for redress of their grievances."[107] Because this is not a civil proceeding and Abbott is not being held liable for

---

[104] 55 F.3d 1430 (9th Cir. 1995).

[105] *Shearin*, 765 A.2d at 938.

[106] *Id.* (citing *In re Palmisano*, 70 F.3d 483 (7th Cir. 1995)).

[107] *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015).

his statements, *Noerr-Pennington* does not apply here. ODC has shown by clear and convincing evidence that Abbott violated Rule 3.5(d).

5.

ODC has also shown by clear and convincing evidence that Abbott's conduct in connection with the transfer of the Properties and his degrading statements violated Rule 8.4(d) (conduct prejudicial to the administration of justice).[108]

6.

In addition to his objections to specific findings of the Panel as discussed above, Abbott has asserted other objections to the disciplinary proceedings.

Abbott claims, and has claimed throughout the various proceedings, that ODC engaged in a "fishing expedition" against him because the Court of Chancery sent the Seabreeze Litigation record to ODC without any explanation. This claim is unfounded. In the June 10, 2015 letter referring Abbott to ODC and enclosing the record in the Seabreeze Litigation, the first sentence states the "Vice Chancellor issued a bench ruling on May 21,

---

[108] *See, e.g.*, *In re Koyste*, 111 A.3d 581, 588-89 (Del. 2015) (lawyer's knowing disobedience of court order and directing his non-lawyer assistant to violate the order violated both Rule 3.4(c) and 8.4(d)); *Abbott*, 925 A.2d at 486–87 (lawyer's degrading statements violated Rules 3.5(d) and 8.4(d)); *Shearin*, 765 A.2d at 939 ("Violations of court orders constitute conduct prejudicial to the administration of justice.").

2015."[109]  The transcript of the May 21, 2015 hearing is less than 35 pages, with discussion of Abbott's role in the sham transfer of the Properties starting on page 20.  No "fishing expedition" was necessary.

Abbott also argues that ODC failed to prove that the PRC approved the Petition, thus rendering this entire proceeding "infirm."[110]  The Panel correctly rejected this argument.  As required by DLRDP 9(b), ODC notified Abbott of the PRC meeting and informed him that he could submit materials to ODC that ODC would provide to the PRC.  After approval of the Petition, ODC, as required by DLRDP 9(d)(1), filed the Petition with the Board Administrative Assistant and served it upon Abbott.  Nothing more is required by ODC as far as the PRC's approval of the Petition.

Abbott next accuses the Vice Chancellor, Panel Chair, and ODC of misconduct.  The record does not reflect any such misconduct.  The Court on the Judiciary previously dismissed Abbott's complaint alleging judicial misconduct by the Vice Chancellor in the Seabreeze Litigation.  As a judicial officer, the Vice Chancellor was supposed to take action when he became aware of reliable evidence indicating the likelihood of unprofessional conduct

---

[109] Ex. 73.
[110] Mar. 22, 2023 Pro Se Respondent/Third Party Petitioner's Objections to the Proceedings, Recommendations, & Misconduct of ODC Counsel and Board Panel Chair at 24.

by Abbott.[111] The Vice Chancellor's compliance with his ethical obligations does not, as Abbott insists, constitute misconduct.

Abbott's claims of misconduct by the Panel Chair, including denial of his motions for recusal, also fail. These claims are based primarily on Abbott's disagreement with the Panel Chair's rulings, but ruling against a party does not mean a hearing officer is biased or otherwise engaging in misconduct as Abbott believes.[112] Abbott's contention, without any factual basis, that former Chief Disciplinary Counsel arranged for the appointment of the Panel Chair to rig the proceeding against Abbott is also meritless. Nor is there anything sinister in the Panel Chair, a former member of the Board of Bar Examiners, serving as the chair of a panel for a matter before the Board of Bar Examiners while this matter, in a different tribunal, was proceeding. The record reflects that the Panel Chair exercised commendable diligence and patience in resolving the multitude of arguments and attacks made by Abbott.

Abbott also asserts multiple ethical violations and instances of prosecutorial misconduct by ODC attorneys. Underlying most, if not all, of these claims is Abbott's "belief that he should not be under disciplinary

---

[111] Judges' Code of Jud. Conduct R. 2.15 ("A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer.").

[112] *See, e.g.*, *Gattis v. State*, 955 A.2d 1276, 1284 (Del. 2008) (recognizing that a judge's adverse rulings or critical remarks do not ordinarily support a bias or appearance of impropriety claim).

investigation, and that the person charged with that task should be disqualified for performing it."[113]   This misguided belief is not a legitimate basis for the disqualification of every ODC attorney who ever worked on this case or for a mistrial as Abbott has contended.

As to the attorney-client privilege issues Abbott raises, ODC did not act improperly in seeking his privileged communications with Jenney regarding the transfer of the Properties.  The Board Chair and Panel Chair correctly determined that these communications were discoverable under *In re Kennedy*.[114]   As the Board Chair and Panel also recognized, Jenney waived the attorney-client privilege for these communications at the April 13, 2015 hearing in the Court of Chancery by voluntarily testifying that Abbott advised him to transfer the Properties so he would not have to comply with the court order.[115]

Contrary to Abbott's contentions, Chief Disciplinary Counsel's reference to other communications between Abbott and Jenney, which the Panel later found to be privileged and inadmissible, in his opening statement

---

[113] *Abbott*, 2019 WL 937184, at *8.
[114] 442 A.2d 79, 92–93 (Del. 1982) (holding attorney could not invoke the attorney-client privilege to prevent this Court's Censor Committee from conducting an audit of the attorney's financial records for compliance with guidelines on retention of client funds).
[115] DRE 510(a) ("A person waives a privilege conferred by these rules . . . if such person . . . intentionally discloses or consents to disclosure of any significant part of the privileged or protected communication or information.").

did not require a mistrial. Abbott objected to ODC counsel raising matters he claimed were outside the scope of the disciplinary petition, but did not object on the basis of attorney-client privilege. The Panel Chair ruled that Abbott could raise the objection when a witness was testifying, which is what occurred. Abbott has not shown any "manifest necessity" or other basis for a mistrial.[116]

Abbott also asserts statute of limitations and laches defenses. The Panel correctly concluded that these defenses were without merit. Under the DLRDP, there is "no statute of limitations with respect to any proceedings under these Rules."[117] As to his laches defense, Abbott had the burden of proving the delay was unreasonable and prejudice resulted from the delay.[118] Abbott has not satisfied this burden. Abbott repeatedly sought and obtained postponements, stays, and extensions throughout the proceedings. Most, if not all, of the delay is attributable to Abbott's actions. He has also failed to show prejudice to him from the delay for which he is primarily responsible.

Finally, Abbott asserts multiple violations of his constitutional rights, including his right to confront his accuser (the Vice Chancellor) under the Sixth Amendment, his right to due process under the Fifth and Fourteenth

---

[116] *Banther v. State*, 977 A.2d 870, 890 (Del. 2009).
[117] DLRDP 26.
[118] *In re Tenenbaum*, 918 A.2d 1109, 1111–12, 1127 (Del. 2007).

66

Amendments, and his right to equal protection under the Fifth and Fourteenth Amendments.

There was no violation of Abbott's right to confront his accuser. The Sixth Amendment protects an accused's right to confront witnesses against him in a criminal prosecution. This proceeding was not a criminal prosecution.[119] In addition, the Vice Chancellor explained the reasons for his rulings, as well as why he was referring Abbott to ODC, on the record in the Seabreeze Litigation.

As to Abbott's due process claims, disciplinary proceedings contain "extensive procedural due process protections" for respondents.[120] These protections include: (i) notice of ODC's intent to present a matter to the PRC and the opportunity to submit a written statement for the PRC to consider;[121] (ii) the PRC's determination of whether there is probable cause to support the petition;[122] (iii) if the petition is approved by the PRC, the opportunity to file an answer to the petition;[123] (iv) the ability to compel by subpoena the production of documents or witness testimony;[124] (v) a hearing that is

---

[119] *See supra* n.97 and accompanying text.
[120] *Abbott*, 2019 WL 937184, at *5.
[121] DLRDP 9(b)(1).
[122] *Id.* 9(b)(3).
[123] *Id.* 9(d).
[124] *Id.* 12(a)(2).

recorded;[125] and (vi) the opportunity to submit objections to the Panel's report and *de novo* review of the Panel's report and recommendations by this Court.[126]

Abbott argues that he was deprived of due process because the Panel Chair quashed his interrogatory subpoenas, deposition and document subpoenas, and trial subpoenas. Denying a party discovery that they cannot establish any entitlement to is not a due process violation. First, the Panel Chair correctly concluded that the DLRDP do not authorize interrogatories.[127] Second, the DLRDP permit parties to subpoena the testimony of witnesses and the production of "pertinent" documents at a deposition or hearing, not to compel the disclosure of irrelevant, privileged, or otherwise protected information.[128]

Despite the strong policy against discovery of judicial officers, Abbott chose to direct the majority of his subpoenas to current and former judicial officers and to seek disclosure of their mental processes in making or not making certain rulings. As the Panel Chair correctly concluded in his February 22, 2021 decision granting the judicial officers' motions to quash,

---

[125] *Id.* 9(d)(4).

[126] *Id.* 9(e); *In re Martin*, 105 A.3d 967, 974 (Del. 2014) (*de novo* review).

[127] DLRDP 12 cmt. ("Former section (c) concerning interrogatories has been eliminated."); DLRDP 15(b) (providing "that discovery procedures shall not be expanded beyond those provided in Rule 12").

[128] DLRDP 12(a)(2).

such discovery is not permitted.[129] The Panel Chair also did not err in finding that Abbott could not compel the production of privileged information in the possession of the Board's Administrative Assistant and current and former Board Chairs.

As to Abbott's subpoenas directed to opposing counsel and ODC, the Panel Chair correctly determined that Abbott could not obtain disclosure of privileged information and had not overcome the prosecutorial privilege by asserting a colorable claim of vindictive prosecution (a violation of due process) or selective prosecution (a violation of equal protection). "[V]indictive prosecution arises from 'specific animus or ill will.'"[130] "There is no vindictiveness as long as the prosecutor's decision is based upon the normal factors ordinarily considered in determining what course to pursue, rather than upon genuine animus against the defendant for an improper reason

---

[129] *See, e.g.*, *Evans v. J.P. No. 19*, 652 A.2d 574, 577 (Del. 1995) ("[E]xamination of a judge's mental process would be destructive of judicial responsibility and undermine the integrity of the judicial process."); *Brooks v. Johnson*, 560 A.2d 1001, 1002 (Del. 1989) ("Persons performing adjudicatory functions are not subject to examination in furtherance of the litigation objectives of the parties."); *United States v. Roth*, 332 F. Supp.2d 565, 567 (S.D.N.Y. 2004) (recognizing that "the overwhelming authority from the federal courts in this country, including the United States Supreme Court, makes it clear that a judge may not be compelled to testify concerning the mental processes used in formulating official judgments or the reasons that motivated him in the performance of his official duties."); *State ex rel. Kaufman v. Zakaib*, 535 S.E.2d 727, 735 (W.Va. 2000) (holding "judicial officers may not be compelled to testify concerning their mental processes employed in formulating official judgments or the reasons that motivated them in their official acts.").
[130] *In re Kelly*, 283 A.3d 580, 2022 WL 32070230, at *9 (Del. Aug. 10, 2022) (TABLE) (quoting *State v. Wharton*, 1991 WL 138417, at *10–11 (Del. Super. Ct. June 3, 1991)).

or in retaliation for exercise of legal or constitutional rights."[131] ODC began investigating Abbott after the Vice Chancellor referred him to ODC for his conduct in the Seabreeze Litigation. ODC investigated Abbott's conduct in the Seabreeze Litigation and prepared a disciplinary petition that the PRC approved for filing. The record is devoid of any credible evidence that ODC's investigation and filing of the disciplinary petition is based upon animus of ODC counsel toward Abbott or retaliation for his exercise of constitutional rights.

Abbott also contends that he was entitled to discovery regarding ODC's selective prosecution of sole practitioners like himself in violation of the Equal Protection Clause. "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution protects against arbitrary and capricious classifications, and requires that similarly situated persons be treated equally."[132] A *prima facie* case of selective prosecution requires showing: (i) a policy to prosecute that had a discriminatory effect on a protected class; and (ii) was motivated by a discriminatory purpose.[133] To obtain discovery for a selective prosecution defense as Abbott does here, he

---

[131] *United States v. DeMichael*, 692 F.2d 1059, 1061 (7th Cir. 1982).

[132] *Sisson v. State*, 903 A.2d 288, 314 (Del. 2006).

[133] *Drummond v. State*, 909 A.2d 594, 2006 WL 2842732, at *2 (Del. Oct. 5, 2006) (TABLE).

70

is not required to make a *prima facie* case, but must present some evidence tending to show the essential elements of selective prosecution.[134]

The Panel Chair correctly concluded that Abbott failed to make a threshold showing of the essential elements of selective prosecution. Abbott has not shown that sole practitioners are members of a protected class. Nor has he shown ODC had a policy to prosecute having a discriminatory effect on sole practitioners or was motivated to discriminate against sole practitioners. To support his selective prosecution claim, Abbott relies on ODC's dismissal of five disciplinary complaints he filed against opposing counsel who were not sole practitioners. But as the Panel Chair recognized, none of those complaints involved a lawyer found to have committed wrongdoing or referred to ODC by the trial judge like Abbott was. Abbott has not shown selective prosecution by ODC.

7.

Finally, the Panel erred in qualifying Abbott as an expert witness on Rule 3.4(c), Rule 3.5(d), and the First Amendment. Abbott did not have the knowledge, skill, experience, training, or education to qualify as an expert witness on these subjects under D.R.E. 702. The Panel's reasoning that Abbott qualified as an expert because he satisfied the low threshold for expert

---

[134] *Wharton*, 1991 WL 138417, at *5.

71

qualification under D.R.E. 702 and had more knowledge as a lawyer than the lay member of the Panel would make any respondent lawyer an expert witness in a case with a hearing before a Board panel. Abbott could make his arguments concerning the meaning and history of the DLRPC and the First Amendment without being qualified as an expert. Although the Court rejects the Panel's qualification of Abbott as an expert witness, the Court has nonetheless considered the arguments Abbott made as an expert witness.

## B.

We next determine the appropriate sanction for Abbott's violations of Rules 3.4(c), 3.5(d), 8.4(a), 8.4(c), and 8.4(d). "The objectives of the lawyer disciplinary system [in Delaware] are to protect the public, to protect the administration of justice, to preserve confidence in the legal profession, and to deter other lawyers from similar misconduct."[135] Lawyer disciplinary sanctions "are 'not designed to be either punitive or penal.'"[136] "The focus of the lawyer disciplinary system in Delaware is not on the lawyer, but rather on the danger to the public that is ascertainable from the lawyer's record of professional misconduct."[137]

---

[135] *In re Bailey*, 821 A.2d 851, 866 (Del. 2003).
[136] *In re Landis*, 850 A.2d 291, 293 (Del. 2004) (quoting *In re Garrett*, 835 A.2d 514, 515 (Del. 2003)).
[137] *In re Fountain*, 878 A.2d 1167, 1173 (Del. 2005).

In determining the appropriate sanction, the Court considers the four factors set forth in the ABA Standards and Delaware precedent.[138] The ABA factors are: (i) the ethical duty violated; (ii) the attorney's mental state; (iii) the extent of the actual or potential injury caused by the attorney's misconduct; and (iv) aggravating factors[139] and mitigating factors.[140] Based on the first three factors, the Court makes an initial determination of the presumptive sanction.[141] The Court then considers the fourth factor to determine whether the presumptive sanction should be increased or decreased.[142] The ABA Standards do not account for multiple charges of misconduct, but provide that the "ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct

---

[138] *Beauregard*, 189 A.3d at 1251; *In re Steiner,* 817 A.2d 793, 796 (Del. 2003).

[139] Aggravating factors include prior disciplinary offenses, dishonest or selfish motive, a pattern of misconduct, multiple offenses, bad faith obstruction of the disciplinary proceeding, submission of false evidence or false statements during the disciplinary process, refusal to acknowledge wrongful nature of conduct, vulnerability of victim, substantial experience in the practice of law, indifference to making restitution, and illegal conduct, including the use of controlled substances. ABA Standards 9.22.

[140] Mitigating factors include absence of a prior disciplinary record, absence of a dishonest or selfish motive, personal or emotional problems, timely good faith effort to make restitution or to rectify consequences of misconduct, full and free disclosure to disciplinary board or cooperative attitude toward proceedings, inexperience in the practice of law, character or reputation, physical disability, mental disability or chemical dependence, delay in disciplinary proceedings, imposition of other penalties or sanctions, remorse, and remoteness of prior offenses. ABA Standards 9.32.

[141] *Steiner*, 817 A.2d at 796.

[142] *Id.*

73

among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct."[143]

Abbott objects to what he sees as the Panel's undue reliance on the ABA Standards, but this Court has consistently looked to the ABA Standards for guidance in determining the appropriate sanction for a disciplinary violation.[144] Abbott also argues that the Panel deviated from the four-step framework by adding consideration of the presumptive sanction as an improper, fifth step. He is mistaken. The Panel considered the first three steps to make an initial determination of the presumptive sanction and then considered the aggravating and mitigating factors as set forth in the ABA Standards and Delaware disciplinary cases.

ODC objects that the Panel erred in its application of the aggravating factors to the presumptive sanction and should have recommended disbarment as the appropriate sanction. We address these objections (to the extent necessary) and Abbott's remaining objections (to the extent they are not simply a rehash of his arguments that he committed no violations of the DLRPC) below.

---

[143] ABA Standards, II.
[144] *Fountain*, 878 A.2d at 1173.

Applying the ABA Standards, Abbott's violations of Rules 3.4(c), 8.4(a), 8.4(c), and 8.4(d) in connection with the transfer of the Properties constitute a breach of his duties owed to the public (ABA Standard 5.0) and the legal system (ABA Standard 6.0), including abuse of the legal process (ABA Standard 6.2). His mental state was intentional and knowing because he purposefully advised Jenney to transfer the Properties so that Jenney would not have to comply with his obligation under the Consent Order and March 3, 2015 Bench Rulings to trim the trees and shrubs on the Properties.[145] Abbott also advised Jenney that he could transfer the Properties back to himself.[146] Abbott's strategy was designed to benefit Jenney by allowing him to escape obligations he did not want to perform under the Consent Order while staying in the neighborhood and maintaining control of the Properties at a minimal cost.[147] Abbott also intentionally misrepresented the nature and effect of the transfer of the Properties in his March 16, 2015 Letter to the Court of Chancery.[148]

---

[145] The ABA Standards define "intent" as "the conscious objective or purpose to accomplish a particular result" and "knowledge" as the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards, III Definitions. *See also supra* Sections I.C., I.D.

[146] *See supra* Section I.C.

[147] *See supra* Sections I.C., I.D.

[148] *See supra* Section IV.A.3.

Abbott's violations caused Seabreeze injury[149] and, contrary to the Panel Majority's findings, potentially serious injury.[150] As a result of Abbott's actions, Seabreeze had to spend additional time and incur additional legal fees to enforce rights it had previously bargained for under the 2012 Settlement Agreement and 2014 Consent Order.[151] If Abbott's tactics had worked as he intended, the Court of Chancery would have dismissed the Seabreeze Litigation for mootness and Seabreeze would have been forced to initiate and pursue another legal action against Mrs. Jenney for trimming of trees and shrubs on the Properties.[152]

Abbott's violations also caused significant and potentially serious adverse effects on the Seabreeze Litigation as well as serious interference and potentially serious interference with the Seabreeze Litigation. Disregard of a court order "seriously undermines the legal system."[153] As a result of Abbott's actions, the Court of Chancery had to expend scarce judicial resources

---

[149] The ABA Standards define "injury" as "harm to a client, the public, the legal system or the profession which results from a lawyer's misconduct." ABA Standards, III Definitions. ABA Standards 6.11 and 6.21 include serious injury to a party.

[150] The ABA Standards define "potential injury" as the "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards, III Definitions. ABA Standards 6.11 and 6.21 include potentially serious injury to a party.

[151] *See supra* Section I.D.

[152] This would have included serving Mrs. Jenney, which Abbott and Jenney discussed how to make difficult. *See supra* Section I.C.

[153] *Tonwe*, 929 A.2d at 780.

resolving multiple motions and holding multiple hearings relating to the Properties Transfer.[154] If Abbott's tactics had worked as intended, the Court of Chancery would have been burdened with yet another case arising from Jenney's unwillingness to trim trees and shrubs on the Properties.

Under our precedent, Abbott's misrepresentations in the March 16, 2015 Letter to the Court of Chancery concerning a scheme he devised for his client not to comply with a court order adversely reflected—to a significant extent—on his fitness to practice law.[155] Based on the analysis set forth above, the presumptive sanction for Abbott's violation of Rules 3.4(c), 8.4(a), 8.4(c), and 8.4(d) in connection with the transfer of the Properties is disbarment under ABA Standards 5.11,[156] 6.11,[157] and 6.21.[158]

---

[154] *See supra* Section I.D.

[155] *In re McCarthy*, 173 A.3d 536, 2017 WL 4810769, at *2, 7 (Del. Oct. 23, 2017) (TABLE) (approving Board panel's recommendation of disbarment where attorney failed to disclose to the court that his client had altered medical records); *Vanderslice*, 2015 WL 3858865, at *14 (approving Board panel's recommendation of disbarment where attorney misappropriated client fees and failed to disclose the full extent of his misappropriation during disciplinary proceedings).

[156] ABA Standard 5.11(b) provides that "[d]isbarment is generally appropriate when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

[157] ABA Standard 6.11 provides that "[d]isbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding."

[158] ABA Standard 6.21 provides that "[d]isbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding."

We agree with the Panel that Abbott's degrading statements in violation of Rules 3.5(d) and 8.4(d) involve breaches of duties owed to the legal system (ABA Standard 6.0) and legal profession (ABA Standard 7.0). The Panel did not address Abbott's mental state, but we find that he intentionally and knowingly made the degrading statements.[159] The record in the Seabreeze Litigation clearly demonstrates why the Vice Chancellor referred Abbott to ODC yet Abbott persistently—and baselessly—stated that the Vice Chancellor fabricated the record, the Vice Chancellor acted out of spite or mental disability, and this Court ignored ODC's misconduct in pursuing the matter. He made these statements despite being publicly reprimanded in 2007 for making similarly improper statements.[160] At that time, the Court warned Abbott:

> Zealous advocacy never requires disruptive, disrespectful, degrading or disparaging rhetoric. The use of such rhetoric crosses the line from acceptable forceful advocacy into unethical

---

[159] A violation of Rule 3.5(d) does not require intent. *Ramunno*, 625 A.2d at 250 ("[I]t is irrelevant whether Mr. Ramunno intended to cause disruptive effect. Instead, the sole question before the Court is whether Mr. Ramunno's rude and uncivil behavior was degrading to the court below.").

[160] *Abbott*, 925 A.2d at 485–86 (holding Abbott violated Rule 3.5(d) and 8.4(d) when he made statements about opposing counsel fabricating legal grounds and implying the trial court might rule on a basis other than the merits of the case). In August 2022, Abbott moved to vacate the sanction—public reprimand—imposed in this 2007 case. The Court denied the motion, concluding that even if Superior Court Civil Rule 60(b) applied as Abbott contended, he had not shown a basis for relief under Rule 60(b)(1), (b)(4), and (b)(6). Abbott also rehashed many of the same arguments that he had raised in his 2007 motion for reargument, which the Court had denied.

conduct that violates the Delaware Lawyers' Rules of Professional Conduct.[161]

Abbott, however, chose to deploy such degrading rhetoric again.

We also agree with the Panel that Abbott's degrading statements caused potential injury to the legal system and the legal profession. Public trust in the legal system may be undermined if an attorney makes unsupported statements that a judge ruled against him or his client for reasons other than the merits of the case, such as personal dislike or emotional instability. Abbott argues that there can be no injury because his statements were confidential, but he made the degrading statements in multiple venues to be viewed by multiple people. Based on the Court's previous imposition of a public reprimand in 2007 for Abbott's violation of Rules 3.5(d) and 8.4(d), the Panel correctly determined that Standard 8.2 applied. Standard 8.2 provides that suspension is generally appropriate when a lawyer has been reprimanded for similar misconduct and engages in similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

## 2.

We agree with the Panel's conclusion that the aggravating factors outweigh the mitigating factors. Assuming without deciding that the Panel

---

[161] *Id.* at 489.

correctly found that the aggravating factor of prior disciplinary history should not apply here, we note the existence of numerous other aggravating factors, including multiple offenses in a disciplinary proceeding, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. The aggravating factors of vulnerability of the victim, indifference to making restitution, and illegal conduct, including the use of controlled substances, are not relevant here.

Contrary to Abbott's contentions, his actions in connection with the transfer of the Properties were dishonest. He assisted Jenney's disobedience of his obligations under the Consent Order and March 3, 2015 Bench Rulings while still maintaining control of the Properties and misrepresented Jenney's control over the Properties after the transfer to the Court. He made degrading statements and threatened to create a public spectacle with the selfish motive of pressuring ODC to drop this matter.

We reject Abbott's objection that his degrading statements about the Vice Chancellor and this Court between 2016 and 2019 did not constitute a pattern of misconduct. We also reject Abbott's contention that his offenses were not multiplicitous because he did not violate any of the DLRPC. As previously discussed, Abbott did violate the DLRPC in connection with both the transfer of the Properties and the degrading statements.

Whether Abbott's filing of multiple motions for recusal of Board Chairs and the Panel Chair and service of repetitive subpoenas constitute bad faith obstruction of the disciplinary proceeding is a close question, but ultimately we cannot find that Abbott violated the DLRDP or orders of the Board in this respect.[162] Nor does the aggravating factor relating to deceptive practices apply here. Although Abbott argues that ODC engaged in deceptive practices, this is based on his incorrect position that there was no basis for the disciplinary proceedings.

And it is beyond dispute that Abbott refuses to acknowledge the wrongful nature of the conduct. Indeed, Abbott still insists, despite all evidence to the contrary, that his legal work for Jenney was "Good Lawyering."[163] He also continues to make spurious and unfounded statements about the Vice Chancellor, ODC counsel, and the Panel Chair. Abbott objects that this factor should receive little weight because he is entitled to defend himself, but he could have defended himself without hurling unfounded accusations of corruption and mental illness. As the Court previously warned him, zealous advocacy does not encompass degrading or disrespectful

---

[162] To ensure the effective functioning of the disciplinary process, the Court had to enjoin Abbott from filing additional complaints against disciplinary counsel and initiating new actions in State court related to these proceedings in 2021. *Abbott*, 2021 WL 1996927, at *1–2.

[163] March 22, 2022 Pro se Respondent/Third Party Petitioner's Objections to Proceedings, Recommendations & Misconduct of ODC Counsel and Board Panel Chair at 32, 57.

language.[164] Finally, Abbott's substantial experience in the practice of law—twenty-five years of experience as a Delaware lawyer when he was referred to ODC in 2015—is an aggravating factor.

As to the mitigating factors, Abbott cannot rely on the absence of a prior disciplinary record because he was publicly reprimanded for making statements degrading to a tribunal in 2007. Nor was there the absence of a dishonest or selfish motive.[165] As to personal or emotional problems as a mitigating factor, Abbott objects that the Panel ignored his testimony and his wife's testimony concerning psychological trauma he has suffered as a result of ODC bringing and pursuing these proceedings. We disagree. The Panel correctly recognized that this alleged trauma did not contribute to Abbott's sanctionable misconduct. This objection also rests upon the faulty premise that everyone but Abbott himself is responsible for what has transpired since his actions in the Seabreeze Litigation.

Timely restitution is not relevant here and thus cannot be counted as a mitigating factor. And Abbott has not attempted to rectify the consequences of his misconduct. Again, Abbott has been uncooperative throughout the proceedings and has continued to make degrading statements. Thus, the

---

[164] *Abbott*, 925 A.2d at 488.
[165] *See supra* Section IV.B.2.

mitigating factor relating to a lawyer's cooperative attitude has no application here. Abbott objects that he was entitled to defend himself and pursue independent litigation to protect his rights, but fails to acknowledge that it was unnecessary for him to degrade others and waste Board resources with repetitive motions while doing so.

As previously mentioned, Abbott is an experienced Delaware litigator. Consequently, he cannot claim that inexperience mitigates the seriousness of his offenses. Abbott submitted evidence of good character and reputation, but we agree with the Panel that this evidence was insufficient to constitute a mitigating factor. Abbott has not performed the amount of public service found to constitute a mitigating factor in other disciplinary cases.[166] Like the Panel, we acknowledge that Abbott is an experienced and successful litigator in real estate and land use matters. We also agree with the Panel that this only makes Abbott's misconduct in the Seabreeze Litigation and these proceedings even more unnecessary and senseless.

The mitigating factors relating to physical disability, mental disability, or chemical dependency are not relevant here. The mitigating factor of delay

---

[166] *See, e.g.*, *In re Tenenbaum*, 918 A.2d 1109, 1115, 1137 (Del. 2007) (accepting Board panel's recommended sanction of disbarment, which included finding that the lawyer's record of substantial public and community service, including significant work with Community Legal Aid Society and participation in national and State bar association sections and committees, was a mitigating factor).

in disciplinary proceedings does not apply because Abbott was primarily responsible for any delays.[167] Imposition of other penalties or sanctions also does not apply. Abbott objects that the psychological trauma he has suffered from these proceedings is more than sufficient punishment, but fails to acknowledge his own personal responsibility for what has occurred. Abbott refuses to acknowledge that he committed any wrongdoing, so remorse is not a mitigating factor. Finally, we reject Abbott's contention that his degrading statements in this proceeding are remote from the degrading statements for which he was disciplined in 2007.

Having considered the aggravating and mitigating factors, the Court concludes that the aggravating factors outweigh the mitigating factors. There is no basis for reducing the presumptive sanction of disbarment. Disbarment is also consistent with Delaware authority. In *McCarthy*, the Court accepted a Board panel's recommended sanction of disbarment for a non-Delaware attorney who failed to inform the court that his client had altered medical records and failed to take remedial measures after his client's false deposition and trial testimony in a medical malpractice action.[168] As in this case, ABA

---

[167] *See supra* Section IV.A.6.
[168] 2017 WL 4810769, at *2–5. By devising the scheme for his client to escape his court-ordered obligations, Abbott actually played a more active role than the disbarred attorney in *McCarthy*.

Standards 5.11(b), 6.11, and 6.21 provided for a presumptive sanction of disbarment and the aggravating factors outweighed the mitigating factors.[169] In fact, there were fewer aggravating and more mitigating factors present in *McCarthy* than here.

VI.

For the reasons set forth above, Richard Abbott is DISBARRED effective immediately. Abbott shall pay the costs of the disciplinary proceeding. ODC is directed to file a petition in the Court of Chancery for the appointment of a receiver for Abbott's law practice and to disseminate this opinion in accordance with Rule 14 of the DLRDP.

IT IS SO ORDERED.

---

[169] Neither ABA Standard 6.11 nor 6.21 applied in the *Shearin* cases that the Panel Majority relied upon to recommend suspension.